## BOARD OF LIQUIDATION ET AL. *v.* McCOMB.

1. On the 24th of January, 1874, the legislature of Louisiana passed "the Funding Act," which created a board of liquidation, consisting of the governor and other State officers. Its principal stipulations, aside from that which provided that, prior to the year 1914, the entire State debt should never be increased beyond the sum of fifteen million dollars, are : *First*, that the "consolidated bonds," the issue of which is thereby authorized, shall not exceed in amount fifteen million dollars, or so much thereof as may be necessary for the purpose of consolidating and reducing the floating and bonded debt of the State, amounting to twenty-five million dollars, and consisting of valid outstanding bonds, and valid warrants of the auditor theretofore issued ; *secondly*, that they shall only be used for exchange for said debt at the rate of sixty cents in consolidated bonds for one dollar in such bonds and warrants ; *thirdly*, that a tax of five and a half mills on the dollar of the assessed value of all the real and personal property of the State shall be annually levied and collected for paying the interest and principal of the bonds, and is set apart and appropriated for that purpose, and no other, any surplus beyond paying interest to be used for the purchase and retirement of the bonds ; *fourthly*, that the power of the judiciary, by means of *mandamus*, injunction, and criminal procedure, shall be exerted to carry out the provisions of the act. An amendment of the Constitution was subsequently adopted, which declared that the issue of the consolidated bonds should create a valid contract between each holder thereof and the State, which the latter should not impair ; and directed that the tax should be levied and collected without further legislation. Thereafter, on the 2d of March, 1875, the legislature passed an act authorizing the board of liquidation to issue a portion of such consolidated bonds to the Louisiana Levee Company, in liquidation of a debt claimed to be due it under a contract made in 1871. This debt was not one of those to fund which the consolidated bonds had been issued ; but the act, under which that contract was made, provided and set apart certain taxes, to be levied and collected throughout the State, to meet the payments which would accrue to the company. The Circuit Court, upon a bill filed for that purpose by a citizen of Delaware, who had surrendered his old bonds, and taken sixty per cent of the amount in consolidated bonds, two millions of which had then been issued, granted an injunction restraining the board from using the consolidated bonds, and from issuing any other State bonds in payment of said pretended debt. *Held*, that as the proposed funding of the levee debt at par in the consolidated bonds destroys all benefits anticipated from the funding, on which benefits those who accepted its terms had a right to rely, and makes an unjust discrimination between one class of creditors and another, the injunction, so far as it restrained the funding of said debt in consolidated bonds issued, or to be issued, under the act of Jan. 24, 1874, was properly granted.

2. Although a State, without its consent, cannot be sued by an individual, nor can a court substitute its own discretion for that of executive officers, in matters belonging to their proper jurisdiction, yet, when a plain official

duty, requiring no exercise of discretion, is to be performed, and perform-
ance is refused, any person who will sustain personal injury by such
refusal may have a *mandamus* to compel its performance; and when such
duty is threatened to be violated by some positive official act, any per-
son who will sustain personal injury thereby, for which adequate com-
pensation cannot be had at law, may have an injunction to prevent it.
In such cases, the writs of *mandamus* and injunction are somewhat cor-
relative to each other. In either case, if the officer plead the authority
of an unconstitutional law for the non-performance or violation of his
duty, it will not prevent the issuing of the writ. An unconstitutional
law will be treated by the courts as null and void.

APPEAL from the Circuit Court of the United States for the
District of Louisiana.

*Mr. J. A. Campbell* and *Mr. J. Q. A. Fellows* for the
appellants.

*Mr. Thomas J. Semmes* and *Mr. Robert Mott, contra.*

MR. JUSTICE BRADLEY delivered the opinion of the court.

The decree appealed from in this case was for a perpetual
injunction to restrain the Board of Liquidation of the State of
Louisiana from using the bonds known as the consolidated
bonds of the State, for the liquidation of a certain debt claimed
to be due from the State to the Louisiana Levee Company, and
from issuing any other State bonds in payment of said pre-
tended debt.

The decree was made upon a bill filed by the appellee,
McComb, a citizen of Delaware, in which he alleges that he is
a holder of some of these consolidated bonds, and that the
employment of the bonds for the purpose proposed, namely,
the payment of the claim of the Levee Company, will be a vio-
lation of the pledges given by the act creating the bonds, and
will greatly depreciate their value. The bill sets out the cir-
cumstances of the case, and prays for an injunction. The
defendants demurred; and, the demurrer being overruled, they
declined to answer, and stood upon the supposed defects of the
plaintiff's case. Thereupon the decree appealed from was ren-
dered; and the question is, whether the injunction ought to
have been decreed upon the statements made by the bill.

It appears that, by an act of the legislature of Louisiana,
passed the 24th of January, 1874, called the Funding Act, the
governor of the State, and other State officers, were created a

board of liquidation, with power to issue bonds of the State to an amount not to exceed $15,000,000, or so much thereof as might be necessary for the purpose of consolidating and reducing the floating and bonded debt of the State, and to be called "consolidated bonds of the State of Louisiana;" which bonds were to bear date the 1st of January, 1874, and to be payable in the year 1914, with interest at seven per cent per annum. The act provided that these bonds should be exchanged by the board for valid outstanding bonds of the State and valid warrants of the auditor issued prior to the passage of the act (except warrants issued in payment of constitutional officers of the State), at the rate of sixty cents in consolidated bonds for one dollar in outstanding bonds and warrants; and that they should be used for no other purpose. An annual tax of five and a half mills on the dollar of the assessed value of all the property of the State was levied, and directed to be collected, to pay the interest on these bonds, and to purchase and retire them. Other provisions were added, making it penal for the officers to divert the funds thus provided, or to obstruct the execution of the act, or to fail in the performance of any of the official duties required by it; and it was declared that no court or judge should have power to enjoin the payment of the bonds or the collection of the tax provided therefor. The eleventh section further declared, that each provision of the act should be a contract between the State and each and every holder of the bonds issued under the act: and section thirteen provided that the entire State debt, prior to the year 1914, should never be increased beyond the sum of $15,000,000 authorized by the act; it being declared to be the intent and object thereof, and of the exchanges to be effected under it, to reduce and restrict the whole indebtedness of the State to a sum not exceeding $15,000,000, and to agree with the holders of the consolidated bonds that said indebtedness should not be increased beyond that sum during said period. On the day of passing this act, the general assembly passed another act, proposing to the people of the State an amendment to the constitution of the State, which was adopted at the ensuing election; and provided that the issue of the consolidated bonds authorized by the funding act should create a valid contract between the State and each

holder thereof, which the State should not impair; prohibited the issue of any injunction against the payment of the bonds or levy of the tax; directed that the latter should be levied and collected without further legislation; and declared that, whenever the debt of the State should be reduced below $25,000,000, the constitutional limit should remain at the lowest point reached, until it was reduced to $15,000,000, beyond which it should not be increased.

The language of this clause is explained by the fact that, in 1870, a constitutional provision had been adopted limiting the State debt to $25,000,000; and the further fact, stated in the bill, that in 1874, when the funding act was passed, the outstanding bonds and valid warrants fundable under the act equalled this amount; so that, at sixty cents on the dollar, the debt to be funded would require the issue of the whole $15,000,000 of consolidated bonds. Besides these classes of debts, others to a considerable amount were then outstanding, as will appear further on.

The board of liquidation created by the funding act entered upon the performance of their duties, and, up to the commencement of proceedings in this case, they had issued a little over $2,000,000 under the act.

On the 2d of March, 1875, the general assembly passed an act authorizing the board to issue a portion of the above-mentioned consolidated bonds to the Louisiana Levee Company, in liquidation of a debt claimed to be due it under a contract made with the State in 1871, by which that company was to reconstruct and keep in repair the levees on the Mississippi River and its branches and outlets. The act of 1871, in and by which this contract was made, had provided and set apart certain taxes to be levied and collected throughout the State, to meet the payments which would accrue to the company. But it seems that these taxes had failed to reach their destination, as a committee appointed by the act of 1875, to investigate the subject, reported that there was $1,700,000 still due the company, which had accrued prior to October, 1873, and which the act authorized the board of liquidation to pay in the said consolidated bonds. This debt was not one of the debts to fund which the consolidated bonds had been created. It was not

represented by outstanding bonds of the State, nor by valid warrants. of the State auditor; and the complainant in this case, in his bill, insists that it is not a debt of the State at all, being provided for by the special taxes appropriated for its payment.   Another objection made to the proposal to fund it is, that it is to be paid in full, whilst the funding act authorized the payment of only sixty cents on the dollar of the debts to be replaced by the issue of the consolidated bonds, — the great object of the act being to effect a reduction of the State debt within manageable limits.   It is insisted that the act of 1875, authorizing the appropriation of consolidated bonds to the payment of the levee debt, defeats this scheme, and impairs the validity of the contract made with those who have accepted the bonds according to the terms of the Funding Act, and is therefore void.   The plaintiff, being a holder of these bonds, filed his bill for an injunction to prevent the consummation of the wrong which he alleges will be committed by carrying out the act of 1875.

The decree of the court below is sought to be sustained on several grounds.   In the first place, the appellee contends, that, in consequence of the provisions of the Funding Act, and the constitutional amendment adopted in confirmation of it, the State debt cannot be increased, whereas the assumption of the levee debt (which, it is contended, is not a debt of the State) will directly increase it.   As a part of the same proposition, it is contended that the State has deprived itself of the right to issue any bonds at all, except the consolidated bonds created by the Funding Act, to be exchanged for outstanding debts already existing.

We are not prepared to say that the legislature of a State can bind itself, without the aid of a constitutional provision, not to create a further debt, or not to issue any more bonds. Such an engagement could hardly be enforced against an individual; and, when made on the part of a State, it involves, if binding, a surrender of a prerogative which might seriously affect the public safety.   The right to procure the necessary means of carrying on the government by taxation and loans is essential to the political independence of every commonwealth. By the internal constitution of a government, it is true its legis-

lature may be temporarily restricted in this respect, as we have seen is the case in Louisiana. But how, or at whose instance, such restriction can be enforced, may sometimes be a question of some difficulty. In a clear case, of course, an unconstitutional enactment will be treated as void, as against the rights of an individual. But there are many constitutional provisions mandatory upon the legislature which cannot be directly enforced, — the duty, for example, when creating a debt, to provide adequate ways and means for its payment. It affects the public generally, but no individual in particular, in such manner as to give him a legal remedy. So the State debt may be increased beyond the prescribed limit, without admitting of judicial redress. It may arise indirectly in the accomplishment of public works necessary to the general safety and welfare, in such a manner as to make it difficult to tell when the line is over-passed, or whose claims arose after it had been over-passed. Executory contracts for the preservation of the public levees may be greatly swollen by work rendered necessary by the occurrence of unprecedented floods. Many such cases, and analogous ones, might be readily supposed, in which it would be utterly impossible to observe the prescribed limits of State indebtedness. And as the amount of State debt is a matter of eminently public concern, and the enactment of laws on the subject cannot be controlled by the judiciary, it may admit of doubt, whether, in any case, the courts, at the instance of an individual citizen, even a tax-payer (who would be most directly interested), would undertake to restrain the State officers in the execution of such laws. At all events, the case should be a very clear one, to induce them to interpose by injunction or *mandamus*. But where a person is neither a citizen nor a tax-payer, but is a citizen of another State, and presents himself simply in the character of a creditor of the State, the courts would hardly be justified in interfering on his behalf to prevent a supposed violation of the State constitution by an increase of the State debt. His interest is too remote to give him a standing in court for any such purpose.

But in the case before us, the assumption on which this part of the case is based does not appear to be well founded. It is not the creation of a new indebtedness which the board of

liquidation propose. The amount payable to the levee company for its services is none the less a debt, because it is already provided for by a special tax; and, so far as the State is concerned, it is no more of a public burden when chargeable upon one fund than it is when chargeable upon another. If the general assembly, with the company's assent, sees fit to alter the mode of payment, it is difficult to see who else has a right to complain, unless specially injured by the change. The tax formerly appropriated to it will be liberated and made available for other State purposes. The other creditors of the State cannot possibly be injured, if nothing is appropriated to the payment of the claim which has been pledged to them.

The plea of increase of State indebtedness, therefore, cannot avail in this case; and so much of the decree as prohibits the levee company from receiving any State bonds whatever in liquidation of its claim, is untenable, and must be reversed. The claim itself, for any thing that appears in the record to the contrary, is a perfectly valid one against the State. It is not even alleged to have arisen after the State indebtedness had arrived to the constitutional limit of $25,000,000; nor is it denied that it was founded on a good consideration.

The question, however, remains, whether, even supposing the levee debt to be a valid one, it can be lawfully funded in the consolidated bonds, in view of the other stipulations of the Funding Act.

The principal stipulations of this act, aside from that respecting the increase of the State debt, are: *First*, that the consolidated bonds shall not exceed in amount $15,000,000, or so much thereof as may be necessary, — that is, necessary for the purpose of consolidating and reducing the floating and bonded debt of the State at sixty cents on the dollar; *secondly*, that they shall only be used for exchange for said floating and bonded debt, as designated in the act, which does not embrace the levee debt in question; and that such exchange shall be at the rate of sixty cents in consolidated bonds for one dollar in outstanding bonds and warrants; *thirdly*, that a tax of five and a half mills on the dollar of the assessed value of all the real and personal property of the State shall be annually levied and collected for paying the interest and principal of the bonds, and

is set apart and appropriated for that purpose, and no other, any surplus beyond paying interest to be used for the purchase and retirement of the bonds ; *fourthly*, that the power of the judiciary, by means of *mandamus*, injunction, and criminal procedure, shall be exerted to carry out the provisions of the act.

The precise manner in which these stipulations will be violated by the proposed funding of $1,700,000 of the levee debt at par, as insisted by the plaintiff, is this : *First*, that the entire issue of bonds will be increased by that amount, thereby diminishing the relative security provided for each bond. *Secondly*, that the levee company will receive the full amount of its debt, whilst the complainant, and others in like case with him, have accepted sixty cents on the dollar for their old bonds, on the faith that no one should receive any more. *Thirdly*, that the benefits of the scheme propounded by the Funding Act will be lost by such a violation of it, and all the advantages anticipated by the complainant and others in surrendering their original debts will fail.

In answer to the first of these supposed violations, — namely, that the issue of consolidated bonds will be increased by the amount of the levee debt, — it may be said, that the amount of the consolidated bonds is expressly limited to $15,000,000 ; and there is no pretence that the board of liquidation intend to issue more. The proposed appropriation might have the effect of excluding from the benefit of the Funding Act some of the outstanding obligations of the State originally intended to be embraced within its provisions. But it will not increase the total amount of the consolidated bonds. The complainant can hardly contend that he has a right to prevent the State from using the bonds for funding its other debts, if those for which they were intended should not be surrendered. It is a question of power. The Funding Act gives the board of liquidation power to issue $15,000,000 of these bonds, or so much thereof as may be necessary to fund the outstanding floating and bonded debt ; and it is admitted that the amount of that debt is sufficient to absorb the whole $15,000,000. He cannot say, " I am entitled to the chances of some of the designated creditors not coming in." He cannot be injured, so far as this objection goes, if the amount of bonds ultimately

issued does not exceed the limit of $15,000,000. It may very well be that some of the creditors whose debts were intended to be funded will refuse to come in and accept the terms of the Funding Act. If that should be so, it might greatly embarrass the financial affairs of the State to have to appropriate the entire tax of five and a half mills to a mere fraction of the debt it was intended to provide for, which was $15,000,000. To tie the hands of the State under such circumstances would be to give the complainant the advantage of a technicality, to the great injury of the State. It would be adhering to form rather than to substance. The complainant consented, when he took his bonds, that there might be $15,000,000 of them issued. He cannot justly complain if that amount is not exceeded, even though the debts funded thereby are not precisely those specified in the act, provided the material terms of the act are complied with. In any case, those that are not funded must be provided for in some other way; and, unless some special reason exists why one debt should be funded instead of another, the complainant cannot be injured. He has failed to show any such reason in his bill.

If, therefore, the substitution of one debt for another, in the participation of the benefits of the Funding Act, were all that is proposed to be done by the defendants, the complainant would have great difficulty in maintaining a bill in equity for the purpose of enjoining the officers of the State from carrying out the law passed in 1875. But this is not all that they propose to do. The proposed funding of the levee debt in the manner provided by that act would break up the whole scheme of the Funding Act, and destroy all the benefits anticipated from it, — benefits on which those who accepted its terms had a right to rely.

It was the special object of that scheme, by providing extraordinary security and sanctions for the payment of the consolidated bonds, to induce the public creditors to reduce their claims forty per cent, and exchange them for these new securities, and thus diminish the aggregate indebtedness of the State $10,000,000. This result would enhance the general credit of the State, and enable it to meet all its obligations and engagements with more certainty and less liability to failure.

The complainant and others who have surrendered their old bonds, and taken sixty per cent of the amount in the new bonds in full satisfaction, did so on the faith that the scheme should be carried into effect as a whole, and that all others taking the benefit of the act should be subject to the same condition that they were. It cannot be supposed that they would have made the sacrifice they did, without relying, as they had a right to do, on this essential feature of the scheme being rigidly carried out. The proposal to fund the levee debt at par entirely interferes with its accomplishment, and makes an unjust discrimination between one class of creditors and another.

It is this aspect of the act of 1875, and the proposed proceedings under it, of which the petitioner has special reason to complain, and which furnishes substantial ground for giving him relief.

True, it may be objected even to this view, as to the former one, that the bondholders of the State may refuse to come in and make the sacrifice required by the act; and, in such case, the State ought not to be for ever precluded from making such other disposition of the unissued consolidated bonds as may be beneficial to it, without being injurious to those who have accepted such bonds. If such a state of things should arise, after due time and opportunity shall have been given to test the practicability of carrying out the scheme, it will, undoubtedly, furnish proper ground for modified legislation, having due regard to the rights already vested. But the act in question was passed within three months after the adoption of the constitutional amendment confirmatory of the Funding Act, and before its practicability could possibly have been ascertained; and no attempt was made by the act to reinstate the bondholders who had come in, to their former position, or to return to them the forty per cent of their claims which they had surrendered, or in any manner to obviate the inequality and injustice to which they would be subjected by the change of plan.

In our judgment, therefore, the court below was right in granting the injunction as to the consolidated bonds, if the defendants, occupying the official position they do, are amenable to such a process.

On this branch of the subject the numerous and well-considered cases heretofore decided by this court leave little to be said. The objections to proceeding against State officers by *mandamus* or injunction are: first, that it is, in effect, proceeding against the State itself; and, secondly, that it interferes with the official discretion vested in the officers. It is conceded that neither of these things can be done. A State, without its consent, cannot be sued by an individual; and a court cannot substitute its own discretion for that of executive officers in matters belonging to the proper jurisdiction of the latter. But it has been well settled, that, when a plain official duty, requiring no exercise of discretion, is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have a *mandamus* to compel its performance; and when such duty is threatened to be violated by some positive official act, any person who will sustain personal injury thereby, for which adequate compensation cannot be had at law, may have an injunction to prevent it. In such cases, the writs of *mandamus* and injunction are somewhat correlative to each other. In either case, if the officer plead the authority of an unconstitutional law for the non-performance or violation of his duty, it will not prevent the issuing of the writ. An unconstitutional law will be treated by the courts as null and void. *Osborn* v. *Bank of the United States*, 9 Wheat. 859; *Davis* v. *Gray*, 16 Wall. 220.

> *Decree affirmed, so far as it prohibits the funding of the debt due to the Louisiana Levee Company in the consolidated bonds issued or to be issued under the Funding Act of Jan. 24, 1874; and reversed as to so much thereof as prohibits the issue of any other bonds to said Louisiana Levee Company in liquidation of said debt.*

MR. JUSTICE FIELD did not sit in this case, and took no part in the decision.