HANCOCK (UNITED STATES v.). See Case No. 15,295.

## Case No. 6,012.

### HANCOCK v. WALSH.

[3 Woods, 351; 8 Cent. Law J. 393; 25 Int. Rev. Rec. 160; 8 Reporter, 71.] [1]

Circuit Court, W. D. Texas. April, 1879.

SUIT AGAINST A STATE — ACCEPTANCE BY A STATE OF RESOLUTIONS OF CONGRESS — ANNEXATION OF TEXAS — ENFORCEMENT OF TRUST AGAINST A STATE.

1. A bill filed against the commissioner of the general land office of Texas to restrain him from allowing locations of land within the limits of a grant made to a party under whom complainant claimed, and which was afterwards confirmed

1 [Reported by Hon. William B. Woods, Circuit Judge. and here reprinted by permission. 8 Reporter, 71, contains only a partial report.]

by the state of Texas, is not a suit against the state.

[Cited in Chaffraix v. Board of Liquidation, 11 Fed. 644.]

2. The colonization contract made by the republic of Texas, acting by Samuel Houston, president, on January 22, 1844, with Charles Fenton Mercer, was valid and binding on the republic.

3. By the terms of the joint resolution of the congress of the United States for the annexation of Texas as a state in the Union, she was allowed, as one of the conditions of annexation, to retain the vacant unappropriated lands within her limits, to be applied to the payment of the debts and liabilities of the republic of Texas. This resolution having been assented to by the convention of Texas, it is not within her power to refuse compliance with its conditions.

4. Whether the resolution of annexation, and its acceptance by Texas, is to be considered as a treaty or a contract, it is equally binding on the state, and she cannot escape from its obligation.

5. A state may become a trustee.

6. A trust assumed by the republic of Texas was not extinguished by the formation of the state of Texas and her annexation to the Union, but was fastened upon the state as the sovereign successor of the republic.

7. Neither lapse of time nor any defense analogous to the statute of limitations can be set up by the trustee of an express trust, as a defense to his liability to execute the trust.

[Followed in Preston v. Walsh, 10 Fed. 317. Cited in Claybrook v. Owensboro, 16 Fed. 305.]

In equity. Heard on demurrer to the bill and on motion for injunction pendente lite. The original bill was filed on March 6, 1875, by George Hancock, a citizen of Kentucky, against J. J. Groos, who at that time was commissioner of the general land office of the state of Texas. After the filing of the original bill, to wit, on August 27, 1875, Hancock, the complainant, died, and the suit was revived in the name of William Preston, his devisee, upon a bill of revivor, filed January 26, 1876. Afterwards Groos, the defendant, died, and on April 12, 1879, a bill of revivor and supplement was filed against William C. Walsh, his successor in office, who entered his appearance and filed his demurrer to the original and supplemental bills.

The case made by the original and supplemental bills was as follows: The republic of Texas, after establishing her independence, adopted, substantially, the colonial policy commenced in 1825 by the government of Mexico to induce the settlement and colonization of its lands in Coahuila and Texas. Several acts of the congress of the republic were passed to carry out this policy. By authority of these acts thirteen colonial contracts were entered into by the republic of Texas, through the agency of its president, with various colonial contractors. Among these contracts was one made on January 29, 1844, between Samuel Houston, president of the republic of Texas, and Charles Fenton Mercer, a citizen of Florida, and such associates as he should choose, the original of

which is on file in the state department of the state of Texas. By the terms of this contract it was stipulated that Mercer should, within five years from the date of the contract, settle upon so much of the public domain of Texas as was designated in the contract as "Mercer's Colony," and described by metes and bounds, as many immigrant families as he and his associates could induce to move thereon, at the rate of one family for every section of one square mile of vacant and unappropriated land, with the proviso that at least one hundred families should be settled on said lands during every year of the term of five years for which the contract was to run.

In consideration of the performance by Mercer and his associates of their part of the contract, the republic of Texas agreed to convey to Mercer and his associates one section of six hundred and forty acres of land for every family that they should introduce and settle upon said lands, and to make a full and perfect title therefor to him and his associates as soon as they should exhibit to the proper officers the evidence that said families had been settled on the lands embraced within the limits of the colony, and as a premium and recompense for their labor and expenditures in the performance of the contract, the republic of Texas agreed and covenanted to give, grant and convey to Mercer and his associates, or their legal representatives, one section of six hundred and forty acres, or two half sections of three hundred and twenty acres each, for every ten families introduced and settled by them on said lands in pursuance of the contract. Mercer at once entered into possession of said lands and surveyed and occupied the same by his agents and colonists, in conformity with the provisions of the contract, and did manage and control the same as proprietor thereof, and in order to perform the contract on his part, and as authorized by the contract itself, at once organized a joint stock company, which was called "The Texas Association," composed of many men of wealth and character, and he and his associates in said company, in compliance with the stipulations of their contract, gave their time, labor and services to establish said colony, and did introduce and settle upon said lands not less than one hundred families in each and every year of the five years for which said contract was to run, and well and truly performed all the covenants by them to be performed under the terms of the contract, and for the accomplishment of these ends they subscribed and paid money exceeding twenty thousand dollars. Twelve hundred and fifty-six families were, in fact, introduced and settled within the limits of said colony within five years after the date of the contract by Mercer and his associates, which, under the terms of the contract, would have entitled them to one thousand three hundred and seventy-six sections of land of six hundred and forty acres each. On January 29, 1849, the date at which said term of five years expired, Mercer and his associates offered to exhibit to the commissioner of the general land office of Texas proof of the facts above stated, to wit, of the introduction and settlement of said families, and did in fact make a report, which is now on file in the general land office of Texas, giving the number and names of the colonists and families introduced and settled by them within the limits of the colony, verified by affidavit, and with the names of the required witnesses attesting and verifying all the facts therein stated, and showing the strict performance by Mercer and his associates of their covenants in said contract by them to be performed. The contract between Mercer and the republic of Texas further provided that lands lying within the limits of the Mercer colony, which had not been legally located prior to the date of the contract, should be held subject to be settled by Mercer and his associates for the period of five years, and should be set apart from the public domain and kept free from all future locations and claims, to be colonized in the manner specified in the contract, for the use and benefit of Mercer and his associates. At the date of said contract the republic of Texas was seized by sovereign demesne of all the lands within the limits of the grant to Mercer, and by her statutes held out the promise that in all contracts for colonization an immediate equitable title should vest in the contractor, subject to be divested only upon the non-performance by him of the conditions annexed to the grant. The statutes and contract, taken together, created a trust whereby the state, retaining the legal title, empowered and required her proper officers to convey the legal title to the contractor as soon as evidence was produced of the performance of the contract by him. Yet, notwithstanding the premises, the former commissioner of the general land office of Texas proceeded to issue certificates for lands within the colony of Mercer to all persons holding general certificates of location, and to issue patents therefor, and the defendant Walsh continues to issue patents upon surveys made within the limits of the colony, in violation of said contract. By reason of the performance by Mercer and his associates of the terms of the said contract, they became entitled to have and receive a full and perfect title to 1,256 sections of land within the boundaries of said colony, and also 120 sections of premium lands, being ten sections for every 100 families introduced by them and settled in said colony. Full evidence was adduced, and is of record in the archives of the general land office of the state of Texas, that 1,256 families, claiming and holding under said Mercer, were introduced and settled by him upon land lying within the limits of said colony, according to the terms of said contract

The state of Texas has recognized the con-

stitutionality and binding force of said contract by the decision of her supreme court and by the issue to the colonists under Mercer of 1,256 patents for land in said colony, whereby the title to 1,256 sections was conveyed to the said colonists. There were more than 1,000,000 acres of land lying within the limits of Mercer's colony which have never been located and patented, but remain vacant, and are subject to terms of the contract between the republic of Texas and Mercer, and should, in equity, be reserved for the fulfillment of said contract, and, under the statutes of the state of Texas, it is the duty of the commissioner of the general land office to issue to complainant and his associates certificates for the lands to which the said contract entitles them. The joint stock company, known as "The Texas Association," which was formed under said contract betwen the republic of Texas and the said Mercer, had authority, under the terms of said contract, to name one or more trustees to act for said association, and said association did appoint the said Mercer sole trustee, with full authority and power to bind the association, and act for it in the premises. Mercer accepted the said trust, and continued to discharge the duties of trustee until the year 1852, when he sold and assigned his interest in the property of the association to said George Hancock, who was thereupon duly appointed and chosen trustee and chief agent of the association, in the place of Mercer, and invested with all the powers of such trustee and agent, and said Hancock continued to act as such trustee and agent up to the filing of the bill in this case, and afterwards to the time of his death. The said George Hancock, soon after the sale to him by Mercer of his interest in said contract, came to the state of Texas, and found the rights of other colonial contractors under discussion in the legislature, and in litigation in the courts. He was advised that there would be an equitable adjustment of all colonial contracts, including that of Mercer, and was, for that reason, requested by his associates to await the action of the state and confide in its justice. He did so, and urged the claims of himself and associates under said contract upon the officers of the state. He was thus delayed till 1858, when the supreme court decided in favor of the constitutionality and validity of said contract between the republic of Texas and Mercer. Soon after, the war of Rebellion broke out, which made it impossible for him, during its continuance, to assert his rights. Recently he has constantly petitioned the legislature of the state for redress, but has never received any relief.

After the appointment of said Walsh as commissioner of the general land office of Texas, the present complainant gave him notice in writing of the rights of the Texas Association and of complainant, and requested him not to issue any land certificates or patents for lands within the limits of the Mercer colony. Said Walsh refuses to comply with such request, and threatens to continue, and has continued, and still continues, to issue certificates and patents for lands within the Mercer colony to persons not claiming under or in privity with the contract of Mercer. At the same time the present complainant demanded of defendant Walsh, commissioner of the general land office, that he should issue to complainant, as chief agent of the Texas Association, certificates for 1,376 sections of land, according to the terms of said contract, but Walsh refused, and still refuses, to comply with such demand, and refuses to deliver to complainant any land certificates whatever. No land certificates, or patents for land, have ever been issued either to Mercer, Hancock, the Texas Association or the complainant, for lands to which they were entitled under said contract. George Hancock, the successor as trustee and chief agent of the Texas Association of the said Charles Fenton Mercer, by his last will and testament, appointed the present complainant, William Preston, to act as trustee and chief agent of the Texas Association, maintain and prosecute its claims under said contract, or any suit based thereon, to revive the same, and to do all things which the said Hancock, under the said agreement of association and contract, might do, and did devise or bequeath to said William Preston all his right, title and interest in and to the estate, stock and property of said association. Complainant accepted said trust, and he is now chief agent and trustee of the Texas Association, and has been and is recognized as such by the association and the members thereof.

In the convention which assembled July 4, 1845, to frame a constitution for the state of Texas, preparatory to her admission as one of the United States of America, attempts were made to declare colonial grants and contracts, including the Mercer contract, to be null and void ab initio. All such propositions were defeated, and no clause making such declaration was inserted in the constitution, but an ordinance adopted by the convention declared that the legislature should provide for proceedings in the courts by the attorney-general or district attorneys to test the constitutionality, legality and good faith of all colonization contracts, including Mercer's, entered into by the republic of Texas, and to decide whether the conditions of said contracts had been performed by the contractors. The legislature of Texas has never made any such provision of law as contemplated by the ordinance of 1845, although Mercer and Hancock, and the Texas Association, have made repeated applications for the passage of such an act, whereby they could assert and vindicate their rights in the courts. All colonial contracts made by President Houston for the republic of Texas, except the contract with Mercer, have been adjudicated and settled by

the state of Texas, either by agreement of the contractors with the state, or by judicial proceedings authorized by special legislation for the particular case. The joint resolutions of the congress of the United States, providing for the admission of Texas as one of the states of the Union, declared that the state of Texas should retain all the unappropriated lands within her borders, to be applied to the payment of the debts and liabilities of the republic of Texas, and the convention of 1845, which framed a constitution for the state of Texas, recognized and, in effect, admitted that the contract of Mercer was one of the liabilities of the republic. On February 3, 1845, the republic of Texas, by legislative act, required Mercer and his associates to have the lines of their colony actually surveyed and marked by the first day of April, 1845, and, notwithstanding the great difficulty and expense of making such survey within so short a time, the same was accomplished and marked before the time limited by the act of congress. Neither Mercer nor his associates, nor Hancock, nor the present complainant, have ever abandoned or failed to assert their rights under said contract, but have continually set up the same openly and publicly, and, in all ways open to them, have asserted the validity of said contract, and the full performance of its conditions by said Mercer and his associates.

Such were, in substance, the averments of the original and supplemental bills. The original bill prayed for an injunction restraining the defendant and his successors, in the office of commissioner of the general land office of Texas, from allowing any location or survey of lands lying within the limits of the Mercer colony not yet patented, and from issuing any patent or grant of land within said limits, except to the complainant or the Texas Association, and from doing, or suffering to be done, any act whereby such lands might be located, surveyed or patented to any other person or persons except complainant, to be held by him in trust for the Texas Association. The bill also prayed general relief.

To the original and supplemental bills demurrers were filed on the following grounds: (1) Because the suit is in effect a suit against the state of Texas, and seeks to deprive the state of the right and power of disposing, in her own way, of her own public lands. (2) That if complainant is entitled to any relief, it must be sought through the political department of the government of the state of Texas. (3) That the case made by the bills does not entitle complainant to the relief prayed. (4) That the claim is barred by lapse of time. (5) That defendant is an executive officer of the state of Texas, whose duties are prescribed by law, and that the bill does not show that he has violated or refused to obey the law. (6) The bill is not sworn to. (7) This court is without power to restrain or enjoin defendant, he being an executive officer of a sovereign state. (8) That the acts of defendant complained of in the bill involve the exercise of official discretion, and are not merely ministerial acts, and he cannot therefore be enjoined. (9) The bill shows that defendant cannot refrain from patenting the lands mentioned, without violating an official duty. (10) The bill shows that no injury can come to the complainant pending the suit. At the hearing of the demurrer, counsel for complainant moved for an injunction pendente lite, according to the prayer of the bill. The demurrer and motion were argued at the same time.

William Preston, John Mason Brown, John Hancock, C. S. West, and W. F. North, for complainant.
George McCormick, Atty. Gen. of Texas, for defendant.

WOODS, Circuit Judge. This is not a suit against the state of Texas. In the case of Osborn v. Bank of U. S., 9 Wheat. [22 U. S.] 738, it was held that "in deciding who are parties to the suit, the court will not look beyond the record; that making a state officer a party does not make the state a party, although her law may have prompted his action, and the state may stand behind him as the real party in interest, and that a state can be made a party only by shaping the bill expressly with that view, as when individuals or corporations are intended to be put in that relation to the case." The doctrine of this case was approved in the later case of Davis v. Gray, 16 Wall. [83 U. S.] 203. See, also, Dodger v. Woolsey, 18 How. [59 U. S.] 331; State Bank of Ohio v. Knoop, 16 How. [57 U. S.] 369; Debolt v. Ohio Life & Trust Co., Id. 432; Debolt v. Mechanics' & Traders' Bank, 18 How. [59 U. S.] 380; Jefferson Branch Bank v. Skelly, 1 Black [66 U. S.] 436.

This suit is brought, not against the state, but against an officer of the state, who, it is alleged, without the authority of any valid law of the state is, by an unwarranted assumption of power, so using his official position as to invade rights secured to complainant by the constitution and laws of the United States. This is the very case put by the supreme court of the United States in Osborn v. Bank of U. S., supra, where it is decided that "a circuit court of the United States may enjoin a state officer from executing a state law in conflict with the constitution or a statute of the United States, when such execution will violate the rights of complainant. To the same effect are the cases of Davis v. Gray, supra, and Board of Liquidation v. McComb, 92 U. S. 531. It appears from the bill that Mercer concluded with the republic of Texas, a contract of colonization, that he performed its conditions, that rights have accrued to him and his associates, that these rights have been ascertained and fixed as to quantity and

character, that he and his associates have a vested interest in the lands described in the contract, and that the state of Texas now holds the nominal legal title only, and that the defendant is violating his official duty as land commissioner by issuing to strangers certificates of title to lands which are in fact the property of complainant and his associates. Is it within the power of the state of Texas to disregard the contract made by Mercer with the republic of Texas? If it is not, then, if the commissioner of the general land office is invading the rights of Mercer or his successors under the contract, either with or without the apparent authority of the legislature, his acts should be restrained by this court.

The supreme court of Texas, in the case of Melton v. Cobb, 21 Tex. 539, has held that the contract of the republic of Texas with Mercer was a valid contract. The court, in that case, declares that the legislative recognitions of the contract must be deemed to have put the question of its validity at rest. It was, therefore, binding upon the republic. It was a grant of lands upon a condition subsequent, which condition the bill avers has been performed. It created an obligation on the part of the republic to convey the legal title to the lands as soon as the conditions had been performed. It was a liability of the republic, which held the title to lands which it had contracted to convey, and for which the consideration has been paid in full. It was as complete and binding a liability as a sovereignty could assume. And the debates in, and action of, the convention of 1845, convened to frame a constitution for the state of Texas, show that these colonial contracts, including Mercer's, were regarded as liabilities of the republic. See Debates of the Convention of 1845, pp. 610, 614, 616, 618, 620, 623, 627, 628, 630, 633, 640, 644.

Now, what is the relation of the state of Texas to this liability? By the first of the joint resolutions passed by the congress of the United States for annexing Texas to the United States (5 Stat. 797), it was declared that "congress doth consent that the territory properly included within and rightly belonging to the republic of Texas may be erected into a new state, to be called the state of Texas, with a republican form of government, adopted by the people of said republic by deputies in convention assembled, with the consent of the existing government, in order that the same may be admitted as one of the states of this Union." The second of said joint resolutions declared "that the foregoing assent of congress is given upon the following conditions, to wit: * * * Second, said state, when admitted into the Union, after ceding to the United States all public edifices, fortifications, barracks, * * * and all other means pertaining to the public defense belonging to the republic of Texas, shall retain all the public funds,

debts, etc., * * * and all the vacant and unappropriated lands lying within its limits to be applied to the payment of the debts and liabilities of the republic of Texas, and the residue of said lands, after discharging said debts and liabilities, to be disposed of as the state may direct, but in no event are said debts and liabilities to become a charge upon the government of the United States." These resolutions, on July 4, 1845, were accepted by an ordinance which passed the convention with but one dissenting vote, which was signed by every member of the convention, and which, after reciting the resolutions, declared, "that in order to manifest the assent of the people of this republic, as required in the above recited portions of said resolutions, we, the deputies of the people of Texas, in convention assembled, in their name and by their authority, do ordain and declare that we assent to and accept the proposed conditions and guarantees contained in the first and second resolutions of the congress of the United States aforesaid." Hart. Dig. 44, 47. On the faith of the acceptance of these resolutions, Texas was admitted as a state into the Union of states.

Is it now within the power of Texas to refuse compliance with any of the conditions imposed by these resolutions? It seems to me to be clear that it is not. The passage of the resolutions by the congress of the United States and their acceptance by the deputies of the people of Texas constituted either a treaty or a contract. It probably cannot be considered as a treaty, because it was not made by the president by and with the advice and consent of two-thirds of the senators present, as prescribed by section 20, article 2, of the constitution, unless the long acquiescence of all departments of the government gives it the force and effect of a treaty. Whether it be a treaty or a contract, it is alike within the clause of the constitution of the United States which forbids a state from impairing the obligation of contracts: Green v. Biddle, 8 Wheat. [21 U. S.] 1. If it is to be considered a treaty, it is protected by the second clause of article 6 of the constitution of the United States, which declares: "This constitution and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land." If this is a treaty, the legislature of Texas can no more repeal or annul it than it can annul or repeal a clause in the constitution of the United States. If it is to be considered as a contract it is equally beyond the power of the legislature; for a state is as much forbidden by the constitution from passing laws to impair the obligation of contracts made by herself as by other parties. By no device that a state can resort to can she escape this constitutional prohibition. It is perfectly clear that she cannot authorize her agents to violate her own contracts by leaving it to their

discretion whether they shall violate them or not.

All that the complainant asks in this case is that an officer of the state of Texas may be enjoined from invading his rights by a disregard of the compact made by the state of Texas on the faith of which she was admitted as a state of the Union. The state of Texas has never repudiated the contract made with Mercer. On the contrary, it has been pronounced valid and binding by her supreme court, as we have seen in Melton v. Cobb, supra. The act of the legislature of Texas of February 2, 1850 (Hart. Dig. 702), is the only act to which we have been referred that gives authority to any one to issue certificates to be located within the Mercer colony, and those were to be issued, not generally, but only to settlers in the colony who were entitled to lands under the Mercer contract. and not by the commissioner of the general land office, but by a special commissioner appointed by the governor, who was to hear proof and determine what colonists were entitled to the lands. This is a recognition, rather than a repudiation, of the contract. There is no act of the legislature of Texas directly imposing upon the commissioner of the general land office the duty of issuing certificates for location within the Mercer colony, and if there were, it would be null and void. Nor have we been referred to, or have we been able to find. any act which clothes the commissioner of the general land office with judicial or quasi-judicial functions in regard to the issue of certificates and patents. He is, in regard to these duties, a ministerial officer only.

The ground assumed by complainant, that, by reason of the facts stated in the bill, the state of Texas becomes a trustee for him and his associates, seems to be well taken. A state may become a trustee. Perry, Trusts, § 41. The contract between the republic of Texas and Mercer was a grant of lands to Mercer upon a condition subsequent, which, according to averments of the bill, was performed. The legal title remained in the republic, which thereby became a trustee for Mercer and his associates. 3 Washb. Real Prop. (3d Ed.) 525 et seq. On the execution of the contract, Mercer took a vested estate, defeasible only on the non-performance of the condition. This trust imposed upon the republic of Texas was not extinguished by the formation of the state of Texas and her annexation to the Union, but was imposed and fastened upon the state as the sovereign successor of the republic. New Orleans v. U. S., 10 Pet. [35 U. S.] 662; Smith v. U. S., Id. 326; U. S. v. Arredondo, 6 Pet. [31 U. S.] 691; Pollard's Heirs v. Kibbe, 14 Pet. [39 U. S.] 353.

The state of Texas therefore is in the same plight, as regards the rights of Mercer and his associates, as the republic was, and holds the relation to them of trustee to cestui que trust. We have already seen that the state of Texas. by her own express consent. given in the most solemn manner, agreed to hold the public domain of the republic and apply it to the extinguishment of the liabilities of the republic. She therefore became a trustee for the parties to whom the republic was liable, not only by operation of law. but also by her own express contract. This is an express trust which is defined to be a trust created by instruments that point out, directly and expressly, the property, persons and purposes of the trust. Perry, Trusts, § 24. If the state were, therefore, a party to this suit, it would not be competent for her to set up lapse of time or any defense analogous to the statute of limitations to protect her from being called on to execute the trust. For, as between trustee and cestui que trust, in the case of an express trust, such as this, the statute of limitations has no application and no length of time is a bar. Perry, Trusts, § 836, and cases cited. Much less can an officer of the state— who, according to the averments of the bill, is by his acts, done without warrant of any valid law of the state, invading the rights of the beneficiaries of a trust assumed by the state—plead the lapse of time against the enforcement of the trust. But, even if the defendant were in a position to set up the defense of lapse of time against the relief prayed by the bill, I think the averments of the bill offer reasonable excuse for the delay in bringing the suit, and it is the law of this state that, when such excuse is offered, the court will not apply the limitation. McKin v. Williams, 48 Tex. 89.

It is objected that the bill is not sworn to. The want of verification of the bill is not ground of demurrer. If the bill is not sworn to, the court will not allow an injunction to go unless its averments are sustained by evidence. The laws of congress, of the republic and of the state of Texas, and the facts of public history, of all of which the court takes judicial notice, the exhibits to the bill and the affidavits on file, sufficiently establish its averments.

The foregoing discussion has covered all the grounds of demurrer, and, in the opinion of this court, none of the grounds are well taken. This is not a suit against the state, and does not seek to deprive her of the power of disposing of her own lands in her own way, for the lands which the complainant seeks to appropriate are not the property of the state. The relief sought by the bill may be properly granted by a court of the United States, and the complainant is not compelled to seek his rights through the political department of the state government, to which he and his predecessors have, according to the bill, repeatedly appealed in vain. The acts of the defendant against which relief is prayed are purely ministerial acts. Any law which authorizes the defendant to disregard the contract of the state is null and void, and therefore is not binding in law. If the defendant violates the provisions of a contract protected by the constitution of the United States, it is immaterial whether he is doing it with or without

the apparent sanction of a law of this state, and no claim that defendant is performing an official duty will avail him. The averments of the bill make a case of the highest equity, which imperatively demands the interference of this court to prevent irreparable injury to complainant and his associates. The complainant seeks to enforce an express trust, which no lapse of time can render stale. The case seems to run on all fours with the case of Davis v. Gray, supra, which went up from this district, and in which the governor of the state and the commissioner of the general land office were enjoined from issuing patents for lands within the territory granted by the state of Texas to the Memphis & El Paso Railroad Company. The conclusion seems inevitable that the demurrer must be overruled and that the injunction should go as prayed in the bill. And it is so ordered.