HUNT *v.* STATE HIGHWAY COMMISSIONER.

1. CONTRACTS—VERBAL ACCEPTANCE OF OPTION.
   A verbal acceptance of an option is sufficient to effect a contract, when the option does not require a written acceptance.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 12 Am Jur, Contracts § 39.
[2] 18 Am Jur, Eminent Domain § 386.
[4] 34 Am Jur, Mandamus § 122.
[5] 28 Am Jur, Injunctions § 3.
[6, 7] 18 Am Jur, Eminent Domain § 386.
[8] 28 Am Jur, Injunctions § 350.

2. INJUNCTION—CONDEMNATION PROCEEDINGS—CONTRACTS—FRAUD.

The State highway commissioner's attempt to acquire plaintiffs' lands and rights in land by condemnation proceedings, which land had been purchased under a previously-accepted contract, was enjoinable in a suit in equity, especially where the commissioner filed a cross bill seeking to hold the contract void on ground of fraud.

3. OFFICERS—IMMUNITY FROM LIABILITY—PARTIES.

A State officer who comes into court to assert a claim so far takes the position of a private suitor as to agree by implication that justice may be done with regard to the subject matter irrespective of absence of statute authorizing him to accept liability.

4. MANDAMUS—DISCRETION.

Mandamus will lie to compel a public officer to perform plain official duty requiring no exercise of discretion, where performance has been refused to a person who thereby sustains a personal injury.

5. INJUNCTION—ADEQUACY OF REMEDY AT LAW—THREATENED INJURY.

Injunction may be had to prevent the violation of a duty by some threatened positive act, at the instance of any person who would sustain personal injury thereby that is not adequately compensable at law.

6. HIGHWAYS AND STREETS—STATE HIGHWAY COMMISSIONER—CONDEMNATION PROCEEDINGS—INJUNCTION—CONTRACT TO PURCHASE LANDS.

The State highway commissioner, vested with the duty of acquiring lands and rights in land for highway purposes and with authority to contract therefor and who was provided with a specific fund to fulfill the authority and duty, and who entered into contract to purchase plaintiffs' land was not immune from suit to enjoin him from prosecuting condemnation proceedings for the land, for specific performance of the contract and for money decree.

7. EQUITY — INJUNCTION — CONDEMNATION PROCEEDINGS — SPECIFIC PERFORMANCE—CONTRACTS.

Plaintiff landowners who had contracted to sell land to the State highway commissioner had no adequate remedy at law for their plight arising from the commissioner's prosecution of condemnation proceedings to acquire such land under circumstances disclosed showing that plaintiffs had borrowed money to acquire a new site for their tavern business as neither the condemnation proceedings nor a suit in the court

of claims constitutes a reliable assurance they would be made reasonably whole (CL 1948, § 691.119).

8. Costs—Injunction—State Highway Commissioner—Condemnation Proceedings.

No costs are allowed in landowners' suit to enjoin State highway commissioner from prosecuting condemnation proceedings to acquire the land and to compel specific performance of previous contract to buy the land for highway purposes as authorized by statute.

Appeal from Muskegon; Robinson (Thomas N.), J., presiding. Submitted June 13, 1957. (Docket No. 49, Calendar No. 47,166.) Decided November 26, 1957.

Bill by Fred Hunt, Christine Hunt, F. W. Cooper, and Maline Cooper against Charles M. Ziegler, State Highway Commissioner, to enjoin condemnation proceedings and to secure specific performance of an agreement of purchase. Cross bill to declare void any contract arising from negotiations in respect to purchase. Cross bill dismissed. Decree for plaintiffs. Defendant appeals. Affirmed.

*R. Burr Cochran,* for plaintiffs Hunt.

*Poppen, Street & Sorensen* (*Harold M. Street,* of counsel), for plaintiffs Cooper.

*Thomas M. Kavanagh,* Attorney General, *Joseph A. Sullivan,* Deputy Attorney General, *Edmund E. Shepherd,* Solicitor General, *Victor H. Meier* and *Samuel D. Frane,* Assistants Attorney General, for defendant.

Black, J. A court of equity speaks from this record in favor of individuals and against an executive officer of our State government. Another court, sitting correspondingly in chancery on appeal, reviews

the same record to determine but one encompassing question: whether the decree pronounced below is in accord with principles and maxims of equity. Such is our exordium of approach to a case where one of the parties claims he is immune from the ordinary processes of equity.

Plaintiffs Hunt were—and yet remain so far as the record discloses—owners of certain business property situated in Muskegon county's Muskegon township. When the events we are to consider took place the Hunts' tavern business, so conducted on the premises, was thriving and prosperous. The location was described by the chancellor as being an especially advantageous one, "due to its proximity to industrial plants nearby," and a long-term lease of a portion thereof produced a rental income to the Hunts of $60 per month.

In 1953 most of the mentioned property was marked for acquisition by the State highway department in connection with planned construction of the "Norton-Glade Expressway, a super through traffic route of US-16 leading from a location south of Muskegon Heights around the residential sections to the heart of downtown Muskegon." One Seeley, a veteran right-of-way employee of the State highway department—known in the record "as the district buyer in Grand Rapids"—, approached the Hunts in August of 1953 for the purpose of acquiring such property in behalf of the department. The negotiations continued for some little time and they were aided by several appraisals, the integrity of which is not in serious question. Mr. Hunt, represented by a reputable attorney in the course of these negotiations, insisted he and his wife should receive the total sum of $135,000 for the portion so to be acquired and pointed particularly to the cost of acquiring corresponding new business property and of moving thereto.

About this time Seeley entered into an agreement with one Grace Kuiper, then owner thereof, for acquisition of 2 nearby lots (by Seeley, incidentally— not the highway department). The purpose of such acquisition is explained this way, with full record support, in the chancellor's opinion:

"Lots 5 and 6 were not required for highway purposes, but restricted parking facilities and limited access regulations on Laketon avenue and the Norton-Glade proposed express route made it necessary for Hunt to acquire these lots, together with lot 7, for the relocation of his business as an alternative to losing his location, his tavern license and discontinuing the business which had been highly profitable in that location under Hunt and his predecessors since 1933."

Negotiations between Seeley and Hunt continued until final agreement was reached on a total price— to be paid the Hunts by the highway department in return for a deed to their highway-required premises —of $97,500. The acquisition price was arrived at by attributing $65,000 to "land and buildings" and $32,500 for "Removing and resetting tavern equipment, elevator, refrigeration, and so forth, cancellation of lease, and all damages." The presently-described option so recites.

Relying on this apparently settled agreement, the Hunts went ahead and borrowed $30,600 from the Hackley Union National Bank of Muskegon for the purpose of acquiring the intended new site—including said lots 5 and 6—and preparing to engage in business thereon.

The stated agreement between Seeley and Hunt was reduced to writing in the form of a regular highway department option and it was executed by Mr. and Mrs. Hunt under date of December 28, 1953. It was duly forwarded and processed in the general offices of the highway department, the Hunts' title hav-

ing been meanwhile examined and approved by attorneys in the department. Required administrative steps toward approval and acceptance were noted, on the face of the option, in regular order starting under date of January 12, 1954, and concluding February 5, 1954. On the last-mentioned date, and in pursuance of these notations, the requisite voucher for a check* payable to the Hunts was issued by the highway department to the auditor general's office and, under date of February 17, 1954, the State's check in the sum of $97,500, naming the Hunts and the mentioned Hackley Bank as payees, was issued, and forwarded to the general offices of the highway department. By interoffice communication (dated February 26, 1954) the check was forwarded to the Grand Rapids office of the department. The communication reads:

"Michigan State Highway Department, Interoffice communication. Project 61–47. To L. E. Brillhart, Grand Rapids Office.
"February 26, 1954.
"Attached find the following State warrants payable to the persons named thereon, and documents to be executed when the warrants are delivered:
"Parcel 206. Warrant No. R 606034. Amount $97,500. Payees Fred Hunt & Christine Hunt, Hackley Union National Bank of Muskegon. Document warranty deed.
"Very truly yours,
"Signed: G. M. FOSTER, Chief Deputy Commissioner."

In the meantime, a number of dealings by Seeley in conjunction with acquisition in the Grand Rapids area of highway rights-of-way came under suspicion. Seeley was discharged from his position and crim-

---

* Technically, State vouchers call for issuance of "warrants" rather than "checks." The warrant in this instance was called a check throughout the record and we shall pursue such practice.

inal proceedings were instituted against him. Lovell E. Brillhart, another veteran employee of the department and addressee of the above interoffice communication, was detailed to assume Seeley's duties for the department.

March 9, 1954, Brillhart received a letter from Chief Deputy Highway Commissioner Foster calling on Brillhart for "substantiation of the sum of $32,500 for moving of equipment, and so forth." Brillhart carried the mentioned check—and form of deed to be signed by the Hunts—in his briefcase some 3 or 4 months, meanwhile seeking (according to his testimony) to substantiate the mentioned item of $32,500. He conferred with Hunt several times during this period and, according to Hunt and the chancellor's finding, regularly assured Hunt that the option had been accepted and that he—Hunt—would be paid as soon as the "Seeley investigation" was over. According to Hunt, he was thereafter put off by similar and repeated representations of Brillhart until May of 1955, with no conveyed hint of rescission in the meantime. Finally, and in late September of the same year, the highway commissioner instituted statutory proceedings designed toward acquisition of the Hunts' said property. Brillhart in the meantime had returned (under date of June 28, 1954) the mentioned check to the administrative offices of the highway department. It was held in the latter office until May 26, 1955, at which time it was returned to the auditor general's office for cancellation. The Hunts had no knowledge of these interdepartmental actions and were not apprised of the highway department's ultimately disclosed intentions until the mentioned condemnation proceedings were instituted.

We have related, as briefly as possible, the facts and proceedings which led up to filing of the instant bill and cross bill. The bill was filed by the Hunts,

joined by 2 of their lessees, promptly after institution of the aforesaid statutory proceedings. The bill charges that the option was duly accepted by the department and, considering reliance of plaintiffs Hunt on the stated asseverations of Seeley and Brillhart to their detriment, that it would amount to gross inequity to permit the department to rescind what the bill charges became an effective and enforceable contract of sale to the defendant highway commissioner. The bill seeks an injunction to restrain the mentioned statutory proceedings; decree declaring binding effect of the allegedly-accepted option as a contract between the Hunts and the highway commissioner; specific performance of such contract, and a money decree for payment.

The defendant highway commissioner, having unsuccessfully moved to dismiss the bill for reasons now abandoned,* filed a cross bill against the Hunts alleging materially as follows:

"Cross plaintiff is informed and believes that the course of dealing between said Seeley and cross defendant Hunt hereinbefore described was unlawful and fraudulent as to cross plaintiff and says that it was entered into without cross plaintiff's consent and constituted a fraud against cross plaintiff and the State of Michigan and rendered void and nugatory any contract relative to the land described in the option attached to the bill of complaint, if it should be found, contrary to cross plaintiff's claims, that there was a contract between cross plaintiff and cross defendants relative to the land described in the option attached to the bill of complaint."

The cross bill prays:

"3. If it be determined that a contract did grow out of the option attached to the bill of complaint,

---

* The motion to dismiss included detailed allegation that the agreed consideration for the option was excessive, that Mr. Hunt duly admitted such excessiveness, and that plaintiffs in consequence had entered equity absent clean hands.

that it be decreed that such contract is void and un-enforceable against the cross plaintiff."

The issues made by these pleadings came to due trial in the Muskegon circuit before the Honorable Thomas N. Robinson, circuit judge presiding, and resulted in a decree granting injunctive and other relief to plaintiffs* and dismissing the cross bill. The highway commissioner appeals.

*First: The Question of Acceptance.*

The principal question posed in the briefs, aside from the issue of immunity (considered later), is whether the actions of the highway department, as found below, amounted in equity's view to due acceptance of the option. The chancellor ruled that they did. We agree with his conclusion.

It is unnecessary to review more of the testimonial details to which the chancellor referred in the course of his determination of this question. Hunt's testimony to the point was accepted as against that of Brillhart and we are unable for reasons expressed many times in our reports to say that the latter should have been believed and the former disbelieved. The chancellor found on strength of Hunt's testimony that Brillhart told him—Hunt—on the first occasion of their meeting that "the option had been accepted, that the check for $97,500 had been issued, and would be delivered, when Brillhart received it." Since affirmation on the part of Brillhart to such effect is quite consistent with the administrative steps the department theretofore had pursued toward completion of the negotiated purchase, we conclude, as did the chancellor, that the option was duly accepted. The applicable rule is stated this way in 12 Am Jur, Contracts, § 39, pp 532, 533:

---

* We shall presently mention certain features of the decree having to do with such relief.

"There are various modes of acceptance which are equally conclusive upon the parties. Anything that amounts to a manifestation of a formed determination to accept, communicated or put in the proper way to be communicated to the party making the offer, would doubtless complete the contract. Obviously, the acceptance in writing of the terms of a written proposition to contract completes the contract. Where the offerer requests a promise, but does not prescribe any specific form of acceptance, acceptance may be inferred from acts of the offeree as well as from his words. A verbal acceptance of an option is sufficient when the option does not require a written acceptance;"

and finds support, generally, in *Smith* v. *Mathis,* 174 Mich 262, 271.

That acceptance was communicated orally is of no moment in view of foregoing authority. It follows that the chancellor was empowered on this record of facts to find that the instrument sued upon became a binding obligation of the commissioner and that the latter's belated repudiation thereof, and attempt to acquire the involved lands and rights in land by condemnation, was—unless the commissioner is immune—enjoinable in equity.

Defendant refers us to *LeBaron Homes, Inc.,* v. *Pontiac Housing Fund, Inc.,* 319 Mich 310; *Olson* v. *Sash,* 217 Mich 604; *Nu-Way Service Stations, Inc.,* v. *Vandenberg Bros. Oil Co.,* 283 Mich 551; *Bailey* v. *Grover,* 237 Mich 548; *Steed* v. *Pure Oil Co.,* 260 Mich 699; *Bergman* v. *Dykhouse,* 316 Mich 315; and *Beecher* v. *Morse,* 286 Mich 513, as authority supporting contention that an option must be accepted by a delivered writing. We have examined these cases and find that no one of them is presently applicable on account of materially variant facts. That an option can in specific circumstances be accepted orally is attested by *Smith* v. *Mathis, supra,* and no one of the cited cases tends to weaken such rule.

*Second: The Question of Immunity.*

This question was raised by written objection to entry of decree after the chancellor's opinion had been prepared and filed. The objection is addressed to the court of claims act (CL 1948, § 691.101 *et seq.* [Stat Ann 1955 Cum Supp § 27.3548(1) *et seq.*]) and it is alleged that plaintiffs' remedy, if any, for and on account of the premises of their bill, is exclusively in the court created by such act. The State's immunity from suit is stressed, and defendant says that this in effect is a suit against the State.

The judicial pen must talk plainly here. We are asked to hold that an executive officer of the State—clothed by statute with plenary authority to acquire property and property rights by negotiated purchase and provided by appropriation with the wherewithal for execution of such duty and authority—is immune from equity's remedial process when such process is sought by those who in good faith and with clean hands have been induced to deal with him. Such is the naked issue. It is squarely presented and should be settled in this, a case where all of the trouble stemming from dealings of the plaintiffs with the defendant is preponderantly shown as having been due to conduct and misconduct of the latter's employees.

Before turning to precedent and authority it is well that we reflect a bit on the implicit effect of the projected doctrine. Should we accept it, every property owner whose land or rights in land the commissioner has negotiably acquired absent payment must hereafter look to the court of claims—and to the uncertainty as well as delay of payment under section 19 of the court of claims act (CL 1948, § 691.119 [Stat Ann 1955 Cum Supp § 27.3548(19)]) should that court be possessed of jurisdiction as claimed—for payment should the commissioner refuse to pay. Even though the property owner may have executed

and delivered formal conveyance—even though he may have yielded possession in reliance on agreed forthcoming payment of the stipulated consideration —the court of chancery could afford him no relief. He would stand or kneel at the commissioner's mercy (if any) and the latter's leisurely choice between honor of contract, condemnation proceedings, or defense of suit in the court of claims. No matter the affront to her maxims the commissioner's act or omission might construct within sight and hearing of the chancellor, equity must—in event we approve such doctrine—yield to the imperious challenge, humiliated and disgraced.

From these postulates we turn initially to the fact that defendant unequivocally submitted himself to the jurisdiction and thereby cast aside the vestments of immunity, if such ever were worn by him. There was no thought or suggestion of immunity when the suit was instituted or thereafter during trial thereof. Instead, the defendant commissioner filed a cross bill against plaintiffs seeking the above-quoted affirmative relief with regard to the identical subject matter of plaintiffs' bill. It was not until the chancellor ruled by formal opinion that plaintiffs were entitled to relief, and that the cross bill should be dismissed, that this "I cannot be sued" defense was brought forth.

Equity is impatient with games of such nature— the essence of which is affirmation of jurisdiction should the chancellor rule favorably and a denial of jurisdiction otherwise—and regards entry upon suit by a State officer, through bill or cross bill authorized by him, as carrying with it the acceptance of whatever liability the chancellor may decide is reasonably incident to such pleading and appeal for relief. That the point be made decisive as well as clear, we adopt for cases of present nature Mr. Justice Holmes' oft-quoted declaration in (*Luckenbach*

*Steamship Co.) United States* v. *Norwegian Barque "Thekla,"* 266 US 328, 339–341 (45 S Ct 112, 69 L ed 313),* *viz.:*

"When the United States (here a State officer) comes into court to assert a claim, it (he) so far takes the position of a private suitor as to agree by implication that justice may be done with regard to the subject matter. * * *

"It is said that there is no statute by which the government (here the State officer) accepted this liability. It (he) joined in the suit, and that carried with it the acceptance of whatever liability the courts may decide to be reasonably incident to that act."

Assuming but not deciding that this is a suit against the State, we might well rest determination of defendant's present contention on such enlightened rule. Even so, undersigned members of the Court are inclined to view that the contention should be decided on merit. We turn, then, to what is regarded as controlling authority.

In *Thompson* v. *Auditor General,* 261 Mich 624, 629, this Court quoted with favor from *Board of Liquidation* v. *McComb,* 92 US 531 (23 L ed 623). The supreme court in *McComb,* having paid due respect to the general rule of immunity of State officers from suit, went on to say (p 541):

"But it has been well settled, that, when a plain official duty, requiring no exercise of discretion, is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have a mandamus to compel its performance; and when such duty is threatened to be violated by some positive official act, any person who will sustain personal injury thereby, for which ade-

---

* This rule was cited (in *In re McLouth's Estate,* 281 Mich 191, 205) in support of ruling that a Michigan probate court may as against asserted immunity hear and determine a set-off (to extent of extinguishing the claim) against a claim filed by the United States.

·quate compensation cannot be had at law, may have: an injunction to prevent it."

Mr. Justice POTTER, writing for the Court in· *Thompson,* proceeded on strength of *McComb* (and: *Pennoyer* v. *McConnaughy,* 140 US 1 [11 S Ct 699, 35 L ed 363]) to rule for Michigan this way (pp 629, 630):

"If cases of mandamus and injunction may be brought in the Federal courts in the cases and under the circumstances indicated, in the face of the eleventh amendment to the Constitution of the United States, there can be no reason why as liberal a rule ought not to prevail in the courts of the State."

The defendant's challenge to the jurisdiction must be overruled. The salient reason for such holding is that the legislature has vested the highway commissioner with duty of acquisition of lands and rights in land for highway purposes; with authority to contract with individuals for such purposes and with a specific fund on which he may draw to fulfill the authority and duty so charged upon him.[*] Such legislative action operated, so far as concerns the subject matter of this bill, to take from defendant the right of suit-immunity State officers normally enjoy and to subject him (a) to the injunctive process as prayed and (b) to a decree adjudging the mutually binding effect of his contractual dealings with plaintiffs Hunt.

So far as concerns the question of adequacy of legal remedy, we find that there is no reliable assurance these plaintiffs would be made reasonably whole should they be relegated to suit in the court of claims or the pending condemnation proceedings. Their

---

[*] That the State highway ·commissioner is thus lawfully empowered to enter into binding agreements for acquisition of lands and rights in land is attested by *Church* v. *State Highway Department,* 254 Mich. 666.

plight—which includes the burden of an outstanding mortgage loan with nearly 4 years of accrued interest thereon—is not causally attributable to them and it appeals of right to equity. It is due as previously noted to the perfidy of one of the defendant's employees and inexplicable actions of another.* Equity alone is properly equipped to deal with the situation we view here.

No other question requires discussion. The chancellor's decree† is in accord with applicable principles to which courts of equity adhere and it rightfully adjudges that the defendant may acquire plaintiffs' said property only in accordance with his contract. Affirmed. No costs.

DETHMERS, C. J., and SHARPE, SMITH, EDWARDS, VOELKER, KELLY, and CARR, JJ., concurred.

---

* In this connection we note that defendant's quoted charge of fraud against the Hunts was finally renounced by Brillhart in his testimony and that it is not presently urged upon us in brief or otherwise.

† The chancellor has wisely left open, for future determination should they arise, questions having to do with enforcement of the decretal order that defendant pay plaintiffs the amount which was properly judged due them. This is as it should be, there having been no effort as yet to bring the auditor general and State treasurer into the case as parties.