**SAVE THE VALLEY, INC., Thomas Breitweiser and L. Jae Breitweiser, Plaintiffs,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Christine Todd Whitman, In Her Capacity as Administrator of the United States Environmental Protection Agency, and David A. Ullrich, In His Capacity as Administrator of the United States Environmental Protection Agency, Region 5, Defendants,**

**Indiana Department of Environmental Management, Intervenor Defendant.**

**Cause No. IP 99–0058–C–B/G.**

United States District Court, S.D. Indiana, Indianapolis Division.

Sept. 17, 2002.

E. Scott Treadway, Tabbert Hahn Earnest & Weddle LLP, Sierr L Cutts, Indianapolis, IN, for Plaintiffs.

Sierr L. Cutts, Office of the Attorney General, Indianapolis, IN, Jon M. Lipshultz, Washington, DC, for Defendants.

### *ENTRY ON CROSS–MOTIONS FOR SUMMARY JUDGMENT*

BARKER, District Judge.

Plaintiffs, Save the Valley, Inc. ("Save the Valley"), Thomas Breitweiser and L. Jae Breitweiser, sue the United States Environmental Protection Agency, *et. al.* ("the EPA") under the Clean Water Act ("the Act"), originally known as the Federal Water Pollution Control Act, 86 Stat. 816, as amended, 33 U.S.C. § 1251 *et seq.*, and the Federal Mandamus Statute, 28 U.S.C. § 1361. Pursuant to the citizen suit provision of the Act, 33 U.S.C. § 1365(a), Plaintiffs seek injunctive relief and a writ of mandamus. Plaintiffs contend that the EPA possesses actual knowledge that the State of Indiana has failed to adopt and enforce adequate laws and regulations concerning the discharge of pollutants from concentrated animal feeding operations ("CAFOs"), particularly industrial hog farms, and has failed to require those operations to acquire National Pollutant Discharge Elimination System ("NPDES") permits. Thus, they seek to compel the EPA: (1) to reassume enforcement of Indiana's EPA-authorized NPDES permitting program pursuant to 33 U.S.C. § 1319(a)(2), and (2) to initiate proceedings under 33 U.S.C. § 1342(c)(3) to withdraw approval of Indiana's NPDES program. The state agency responsible for the administration of Indiana's NPDES program, the Indiana Department of Environmental Management ("IDEM"), has intervened as a Defendant in this action.

The EPA, IDEM and Plaintiffs each filed motions for summary judgment on February 4, 2002. For the reasons stated below, the Court hereby GRANTS Plaintiffs' Motion for Summary Judgment with respect to their claim under 33 U.S.C. § 1342(c)(3), and DENIES the EPA's and IDEM's Motions for Summary Judgment on that issue. In addition, the Court GRANTS Defendants' Motion for Summary Judgment with respect to Plaintiffs' remaining claims, and DENIES Plaintiffs' Motion on those issues.

### *FACTUAL BACKGROUND*

Save the Valley, Inc. is a not-for-profit corporation dedicated to protecting the environment. Plaintiffs' Memorandum of Law in Support of Summary Judgment ("Pl.Mem.") at 3. Members of Save the Valley, Inc. live in Indiana near or adjacent to CAFOs. *Id.* Thomas Breitweiser and L. Jae Breitweiser are residents of

Indiana who own and live on property adjacent to a proposed CAFO. *Id.* Plaintiffs had become concerned that, due to what they perceived to be inadequate state regulation of CAFOs, Indiana was becoming a popular state in which to open hog farms. *See* Complaint, ¶ 17. In a letter dated June 2, 1998, Plaintiffs notified EPA and IDEM officials of their belief that Indiana had failed to adequately regulate pollution from confined animal feeding operations. *See* Ex. A to Complaint at 2. On January 20, 1999, Plaintiffs filed their Complaint for Injunctive Relief and for Writ of Mandamus in this court.

### SUBJECT MATTER JURISDICTION

Before we can reach the merits of this action, we must address some jurisdictional issues. Section 1369(b)(1) of the Clean Water Act vests a very limited original jurisdiction in the Circuit Courts of Appeal. Based on that section, the EPA contends that this court does not have subject matter jurisdiction over Plaintiffs' section 1342(c)(3) claim. Rather, according to the EPA, Plaintiffs' claim requires judicial review of an action by the Administrator regarding a state permit program, which would place the claim within the scope of section 1369(b)(1).

■ Section 1369(b)(1) states, in pertinent part, as follows:

Review of the Administrator's action ... (D) in making any determination as to a State permit program submitted under section 1342(b) of this title ... may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person.

33 U.S.C. § 1369(b)(1). The citizen suit provision of the Clean Water Act, on the other hand, allows citizens to bring suit to force the Administrator to perform non-discretionary duties under the Act. 33 U.S.C. § 1365(a)(2). We think the difference between the two provisions is clear. While section 1369(b)(1) allows the Courts of Appeal to review actions actually taken by the Administrator, section 1365(a)(2) allows district courts to require the Administrator to act where she has failed to perform a mandatory duty. *See Armco, Inc. v. U.S. Envtl. Protection Agency,* 869 F.2d 975, 981–82 (6th Cir.1989). Section 1369(b)(1) vests original jurisdiction in the Courts of Appeal only to *review the Administrator's action* in certain very limited categories. We must disagree with the reasoning of *American Canoe Ass'n v. U.S. Environmental Protection Agency,* 30 F.Supp.2d 908, 924 (E.D.Va.1998), on which Defendants rely for the proposition that the section 1342(c)(3) claim belongs in the appellate court. As in this case, the plaintiffs in *American Canoe* brought a claim under the citizen suit provision of the Clean Water Act seeking to compel the Administrator to revoke a state's NPDES permitting program pursuant to section 1342(c)(3). That court recast the plaintiff's claim as a claim that the EPA improperly approved of the state's program, then concluded that this "review of ... [a] determination as to a state permit program" fell within the purview of section 1369(b)(1) rather than the citizen suit provision. *Am. Canoe,* 30 F.Supp.2d at 924. We do not agree that Plaintiffs' claim should be recast in such a manner. The failure to revoke a state's NPDES program when required by law is *a failure to act,* whereas the inappropriate approval of a program is *an act.*[1] Furthermore, the approval of a

---

1. Furthermore, a failure to act cannot logically ever trigger a statute of limitations; if we were to construe this as a claim that the EPA inappropriately approved Indiana's program, it would in any event be time-barred by Section 1369(b)(1) as beyond the one hundred twenty day limitation for bringing a claim to

program may be appropriate based on the existence of a state's legal authority to administer that program, and yet years later it may become necessary to revoke a state's authority due to its failure to properly implement its authority. Plaintiff's section 1342(c)(3) claim is not within the ambit of the very limited jurisdiction contemplated by section 1369(b)(1).[2] Because it is claimed that the Administrator *has not acted*, Plaintiffs ask the Court to compel the EPA to perform duties outlined in section 1342(c)(3), which this court has previously determined to impose mandatory duties. Thus, pursuant to section 1365(a)(2), the case is properly before this court and would not have been properly filed with the Court of Appeals.[3]

■ Another possible hurdle to jurisdiction has already been cleared by Plaintiffs. The citizen suit provision requires that a party first give notice to the Administrator sixty days before a lawsuit is commenced. 33 U.S.C. § 1365(b)(2). The purpose of the notice period is to allow the EPA to avoid expensive and protracted judicial litigation by addressing citizen concerns at the administrative level. *See South Car-*

*olina Wildlife Fed'n v. Alexander*, 457 F.Supp. 118, 124 (D.S.C.1978). What constitutes proper notice is prescribed by EPA regulation. *Id.* In our previous Entry, we rejected the EPA's argument that Plaintiffs were required to exhaust administrative remedies under 40 C.F.R. § 123.64(b) before filing suit.[4] Nonetheless, Plaintiffs did in fact meet the notice requirements found in that regulation as well as those imposed by 33 U.S.C. § 1365(b)(2). The regulation states that an interested party may petition the Administrator to withdraw approval of a state's program by setting out reasons from among those listed in 40 C.F.R. § 123.63. Under section 123.63, reasons for withdrawal deemed sufficient include the failure of the state to exercise control over activities to be regulated, including the failure to issue permits where required, and the failure of the state to inspect and monitor activities subject to regulation. 40 C.F.R. § 123.63(2)(i); 40 C.F.R. § 123.63(3)(iii). In their June 2, 1998 letter, Plaintiffs notified EPA and IDEM officials of their belief that Indiana had "failed to develop regulations controlling the permit process and point source discharge"

---

challenge the EPA's approval of a state's program. Any such claim in any state with an approved program would likely meet the same fate.

2. We must also address that Plaintiffs' Complaint does state an inexplicit, and apparently subsequently abandoned, request for relief under 33 U.S.C. § 1342(b). Plaintiffs have not developed a relevant claim under that section anywhere in the record, not even in response to Defendants' motions for full summary judgment. In any event, a claim in opposition to the EPA's initial approval of Indiana's program would have to have been filed with the United States Court of Appeals for the Seventh Circuit within the one hundred twenty day statute of limitations imposed by 33 U.S.C. § 1369(b)(1). *See* n. 1, *supra*. Therefore, any claim here asserted by Plaintiffs under section 1342(b) is both outside of our

jurisdiction and barred by the statute of limitations.

3. This interpretation finds further support in the federal mandamus statute, 28 U.S.C. § 1361, pursuant to which Plaintiffs also assert jurisdiction here. The federal mandamus statute states that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. We view our jurisdictional footing as sure.

4. Compare to the Administrative Procedure Act (APA), 5 U.S.C. § 704. A party must exhaust administrative remedies, at least to the extent of obtaining a final agency action, before filing suit under the APA. *See Darby v. Cisneros*, 509 U.S. 137, 153–54, 113 S.Ct. 2539, 2548, 125 L.Ed.2d 113 (1993).

from "confined animal feeding operations." Ex. A to Pl.'s Complaint at 2. The letter also explicitly stated that IDEM had failed to issue permits to CAFOs. *Id.* at 3. Plaintiffs did not file this lawsuit until January 20, 1999; EPA and IDEM thus had more than seven months in which to have made some appropriate response, when Plaintiffs were required to wait only sixty days following their notification to file this action. *See* 33 U.S.C. § 1365(b)(2). To require them to wait until the EPA deemed it appropriate to make a response under 40 C.F.R § 123.64 (whenever that might be) would clearly frustrate performance under the citizen suit provision.

For these reasons, we deem our jurisdiction over Plaintiffs' claims to be proper.

### *SUMMARY JUDGMENT ANALYSIS*[5]
#### *Summary Judgment Standard*

■ Summary judgment is properly granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Vitug*

*v. Multistate Tax Comm'n,* 88 F.3d 506, 511–512 (7th Cir.1996). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.,* 150 F.3d 747, 750 (7th Cir.1998). In making this determination, the Court must view all of the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Schwartz v. State Farm Mut. Auto. Ins. Co.,* 174 F.3d 875, 878 (7th Cir.1999); *NLFC, Inc. v. Devcom Mid–America, Inc.,* 45 F.3d 231, 234 (7th Cir.1995).

The moving party bears the initial burden of production to establish "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Devcom Mid–America,* 45 F.3d at 234. The burden then shifts to the non-movant, who may not rest upon mere allegations, but by affidavits, depositions, or other evidence must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Devcom Mid–America,* 45 F.3d at

5. Pursuant to Federal Rule of Civil Procedure 37(c), the EPA moves to strike Exhibits A, F, and V to Plaintiffs' Motion for Summary Judgment. Rule 37(c) provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence ... on a motion any witness or information not so disclosed." As agreed upon in the Amended Case Management Plan entered by this court on July 13, 2001, Plaintiffs were to file disclosures in accordance with Rule 26, including preliminary witness and exhibit lists and preliminary contentions, no later than August 15, 2001. As of the date of this motion, March 4, 2002, Plaintiffs had not filed their disclosures. Thus, Defendants were not aware that the testimony of the witnesses in Exhibits A, F,

and V would be relied upon by Plaintiffs in their summary judgment motion. Exhibit A is the affidavit of a Save the Valley official. Exhibits F and V consist of depositions of IDEM employees that were taken as part of state court proceedings to which the EPA was not a party. Thus, the failure to disclose the witnesses was not "harmless," because the EPA had no opportunity to question them.

Rule 37(c) calls for the automatic and mandatory exclusion of material not disclosed in accordance with Rule 26(a). Because Plaintiffs did not disclose the witnesses whose testimony is contained in Exhibits A, F, and V, and because Plaintiffs have offered no justification whatsoever for their failure, the EPA's Motion to Strike is GRANTED. Plaintiffs' Exhibits A, F, and V were not considered in the present decision on summary judgment.

234. The Court must enter summary judgment when the non-moving party has failed to "come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question ...". *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex*, 477 U.S. at 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265; *Anderson*, 477 U.S. at 249–52, 106 S.Ct. 2505, 91 L.Ed.2d 202). However, if genuine doubts remain, and a reasonable fact-finder could find for the non-moving party, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992).

### Concentrated Animal Feeding Operations and Their Environmental Effects

Animal feeding operations, or "AFOs," are industrial farms that congregate animals, feed, manure and urine, dead animals, and production operations into a small area of land.[6] *See* U.S. Dept. of Agric. & U.S. Envtl. Protection Agency, *Unified National Strategy for Animal Feeding Operations*, § 2.1 (March 9, 1999), available at *http://www.epa.gov/npdes/pubs/finafost.pdf.*Not all AFOs are CAFOs.

AFOs are classified as CAFOs based in part upon the number of animal units they contain. If an AFO contains more than 1000 animal units, it is considered a CAFO.[7] *See id.* at § 4.2; 40 C.F.R. § 122.23. An AFO also qualifies as a CAFO if it contains between 300 and 1000 animal units and discharges pollutants through a man-made structure or into any waters that run through the facility or come into direct contact with the confined animals. *See id.* AFOs with less than 300 animal units can be considered CAFOs if an on-site inspection leads the NPDES permitting agency to conclude that the facility "is a significant contributor of pollution to the waters of the United States." *Id.* However, an AFO is not a CAFO if it discharges only in the event of a 25–year, 24–hour storm event.[8]

Animals in CAFOs are usually kept in pens within larger buildings. Natural Resources Defense Council and Clean Water Network, *America's Animal Factories: How States Fail to Prevent Pollution From Livestock Waste*, Introduction and Executive Summary (December 1998), available at *http://www.nrdc.org/water/pollution/factor/aafinx.asp.* The floors of the pens are slatted so as to collect the waste excreted by the animals into a holding tank located below the floor. *Id.* The

6. We note with some disgruntlement that when discussing factual information concerning CAFOs, Plaintiffs' counsel's citations were often incomplete, sometimes inaccurate, and occasionally even involved non-existent quotations. Needless to say, this imposed substantial additional burdens on the Court.

7. Animal "units" are calculated based upon a formula set out in EPA regulations at 40 C.F.R. § 122, Appendix B. The multiplication factor for swine weighing more than 55 pounds is 0.4, so that it actually takes 2500 swine for an AFO to be automatically categorized as a CAFO. *See also* 40 C.F.R. § 412.10 (feedlots point source category applicable to feedlots housing 2500 swine of 55 pounds or more).

8. A 25–year, 24–hour storm event is defined as a "number of inches of rainfall in a 24 hour period that is expected to occur only once every 25 years." Kristen E. Mollnow, *Concerned Area Residents for the Environment v. Southview Farm: Just What Is A Concentrated Animal Feeding Operation Under the Clean Water Act?*, 5–FALL Alb. L. Envtl. Outlook 11, 16 (2000) (*quoting* U.S. Envtl. Protection Agency, Guidance Manual on NPDES Regulations for Concentrated Animal Feeding Operations, 24–29 (draft 1993)). Maps published by the National Weather Service show the amount of rainfall that constitutes such an event for every location in the United States. *Id.* at n. 111.

waste is then usually piped into storage lagoons, uncovered pits that some have referred to, not unfairly, as "open air cesspools." *See* Marilyn Berlin Snell, *Downwind in Mississippi*, Sierra Magazine, March/April 2002, available at *http://www.sierraclub.org/sierra/200103/profile.asp*. From the storage lagoon, waste is transported to be spread, sprayed, or injected onto croplands or pastures.

Manure is the primary source of AFO pollution. Pl.Ex. K: U.S. Envtl. Protection Agency, Office of Water Standards and Applied Sciences Division, *Environmental Impacts of Animal Feeding Operations*, § 1.2 (December 31, 1998). "Animal manure typically contains nutrients (i.e., nitrogen and phosphorus), pathogens, salts, and heavy metals (e.g., copper)." Pl. Ex. J, U.S. Envtl. Protection Agency, Office of Enforcement, *Compliance Assurance Implementation Plan for Concentrated Animal Feeding Operations*, 3 (March 5, 1998). AFO pollution can negatively impact surface water, groundwater, air and soil. *Id.* at § 1.3. Environmental damage due to CAFOs may occur due to lagoon breakage or spillage or to problems with land application of manure, among other things. One storage lagoon often holds millions of gallons of waste; in the event of a spill or break, thousands of those gallons may flow into creeks, drainage ditches, streams, rivers, or lakes. *See* Kyle Niederpruem, *Short Staffing Makes Policing Polluters Harder*, Indianapolis Star (April 21, 1998) (spill of 9600 gallons of hog manure caused fish kill in Indiana). Manure application fields often contain or are adjacent to such waterways, posing a less concentrated but more imminent threat. An EPA fact sheet describes in more detail how animal feeding operations contribute to pollution:

> Runoff from livestock operations enters water bodies when poor maintenance of waste lagoons, improper design of storage structures, improper storage of animal waste, and excessive rainfall result in spills and leaks of manure-laden water. Overapplication of manure to cropland is another source of animal waste runoff. When livestock manure and other animal waste spills or leaks into surface or ground water, it can create an immediate threat to public health and water resources. This runoff has nutrients, such as nitrogen and phosphorus, that in excess cause algae and other microorganisms to reproduce in waterways, creating unsightly and possibly harmful algae blooms. Explosive algae populations can lower the level of dissolved oxygen, which can cause fish and other aquatic organisms to die. Spills from ruptured waste lagoons and other faulty storage facilities have killed tens of thousands of fish. Animal waste runoff can also be a threat to the health of people who come into contact with affected waters because some of the microbes (bacteria, protozoa and viruses) in animal waste can cause disease.

U.S. Envtl. Protection Agency, Office of Water, *Proposed Regulations to Address Water Pollution from Concentrated Animal Feeding Operations*, 1 (March 2001), EPA 833–F–00–016, available at *http://www.epa.gov/npdes/pubs/CAFO-brochure3.pdf*.

Public and government attention have focused increasingly on the environmental impact of animal feeding operations.[9] In

---

9. The EPA in particular has devoted significant attention to this issue in recent years. In March, 1999, as part of President Clinton's 1998 Clean Water Action Plan, the EPA and the USDA implemented a Unified National Strategy for Animal Feeding Operations. The Unified Strategy for AFOs recognizes the role played by AFOs in the pollution of national waterways, and is intended "to minimize the water quality and public health impacts of

the past twenty years, the trend in the livestock industry has been toward fewer but larger operations. *See id.* A foreseeable result of this trend has been increased reports of large-scale discharges from these facilities, as well as continued runoff of nutrients. *See id.* Indeed, "[s]tates estimate that agriculture contributes to the impairment of at least 173,629 river miles, 3,183,159 lake acres, and 2,971 estuary square miles." Pl.Ex. K: U.S. Envtl. Protection Agency, Office of Water Standards and Applied Sciences Division, *Environmental Impacts of Animal Feeding Operations,* 1 (December 31, 1998). About twenty percent of that damage is attributable to intensive animal operations. *Id.*

In Indiana, the number of operating CAFOs is approximately 550. Memorandum in Support of the Indiana Department of Environmental Management's Motion for Summary Judgment ("IDEM Mem."), Ex. A at 1. IDEM reported that as of January 1, 2001, "there were 2,998 approved confined feeding operations in Indiana."[10] Pl. Ex. AA: *IDEM 2000 Annual Summary Confined Feeding Report.* In 1997, animal feedlots were responsible for 2,391 spills of manure in Indiana, including one single spill of approximately 9600 gallons of hog manure. *See* Niederpruem, *supra.* In the year 2000, a total of 1,120 sites, chosen because they had not sent in manure maintenance plans (MMPs) or had requested exemption from Indiana's MMP requirement, were inspected by IDEM, but 804 of those sites were identified as closed. *Id.* At the remaining 316 sites, fifty-one violations were detected, including 15 lagoon violations and 16 land application violations. *Id.*

In Indiana in 1998, 84% of surveyed river miles and 99% of surveyed lake acres had good water quality that could support aquatic life, though a mere 18% of surveyed river miles could support swimming due to high bacteria concentrations. U.S. Envtl. Protection Agency, *National Water Quality Inventory: 1998 Report to Congress,* 304–305, available at *http://www.epa.gov/305b/98report/chap12hm.pdf.* The pollutants most frequently identified in Indiana waters were bacteria, priority organic compounds, oxygen-depleting wastes, pesticides, and metals. *Id.*

### *The Clean Water Act*

Congress enacted the Clean Water Act in 1972 in order "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). This marked a major transformation in the Nation's approach to water pollution. *See Nat'l Wildlife Fed'n, et. al. v. Gorsuch,* 530 F.Supp. 1291, 1296 (D.D.C. 1982) (citing *A Legislative History of the Water Pollution Control Act Amendments of 1972* (Leg.Hist.) at 1254, 1271, 1280 and 1303), *rev'd on other grounds,* 693 F.2d 156 (D.C.Cir.1982). "Prior to 1972, the program was based upon water quality standards promulgated and implemented by the states with some assistance and oversight from the federal government." *Gorsuch,* 530 F.Supp. at 1296. The method to control pollution was to work backwards from the desired water quality, and discharges were only violations if it could be shown they caused the water body to fail to meet water quality standards. *Id.* The system proved cumbersome and ineffectu-

AFOs." U.S. Dept. of Agric. & U.S. Envtl. Protection Agency, *Unified National Strategy for Animal Feeding Operations,* § 1.1 (March 9, 1999), available at *http://www.epa.gov/npdes/pubs/finafost.pdf.* The Unified Strategy for AFOs is discussed below in more detail.

10. Indiana's independent regulatory system for confined feeding operations, which will be discussed in more detail below, requires state approval for operations above and beyond those that constitute CAFOs under federal regulations.

al. *Id.* Today, the Act works by regulating all discharges of pollutants into waters of the United States. *See* 33 U.S.C. § 1311. It does so through the federally mandated and supervised NPDES permit program. Compliance with the Clean Water Act is determined through compliance with NPDES permits. 33 U.S.C. § 1342(h). NPDES permits "impose limitations on the discharge of pollutants, and establish related monitoring requirements ...". *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 174, 120 S.Ct. 693, 700, 145 L.Ed.2d 610 (2000). All discharges of pollutants into the Nation's waters are regulated by the NPDES permit program. *See* 33 U.S.C. § 1342.

The Clean Water Act "anticipates a partnership between the States and the Federal Government ...". *Arkansas v. Oklahoma*, 503 U.S. 91, 101, 112 S.Ct. 1046, 1054, 117 L.Ed.2d 239 (1992). This relationship has also been aptly characterized as a "distinctive variety of cooperative federalism." *U.S. Dept. of Energy v. Ohio*, 503 U.S. 607, 633, 112 S.Ct. 1627, 1642, 118 L.Ed.2d 255 (1992) (White, J., *concurring in part and dissenting in part*). The Act authorizes the EPA to issue NPDES permits, but States may apply for and receive EPA approval to administer their own permit programs, provided they comply with detailed statutory and regulatory requirements. 33 U.S.C. § 1342(b); 40 C.F.R. §§ 123.1–123.64. The EPA retains a high level of involvement and authority when a State administers its own NPDES permit program. For instance, the EPA continues to review state water quality standards, § 1313(c), retains authority to object to the issuance of particular permits, § 1342(d)(2), monitors state programs for continuing compliance with federal directives, § 1342(c), and enforces the terms of individual NPDES permits when a State has failed to institute enforcement proceedings, § 1319(a)(1). *See also U.S.*

*Dept. of Energy v. Ohio*, 503 U.S. at 634, 112 S.Ct. at 1643.

At issue in the present action are sections 1319(a)(2) and 1342(c)(3). In a previous Entry denying Defendants' Rule 12(b)(1) and Rule 12(b)(6) motions to dismiss, we held that those sections of the Clean Water Act impose mandatory duties upon the Administrator of the EPA. *See Save the Valley, Inc. v. U.S. Envtl. Protection Agency*, 99 F.Supp.2d 981 (S.D.Ind. 2000). Section 1319(a)(2) states that the EPA Administrator shall assume enforcement of a State's permit program when "the Administrator finds that violations of permit conditions or limitations ... are so widespread that such violations appear to result from a failure of the State to enforce such permit conditions or limitations effectively ...". 33 U.S.C. § 1319(a)(2). Section 1342(c)(3) states that the Administrator shall withdraw approval of a State's NPDES program when a State fails to take appropriate corrective action even after being notified by the Administrator that its program is noncompliant. *See* 33 U.S.C. § 1342(c)(3). In the previous Entry, we specifically held that the Act requires the Administrator "to make a 'finding' under § 1319(a)(2) or a 'determination' under § 1342(c)(3) ... when [s]he becomes aware of such violations as articulated in § 1319(a)(2)." *Save the Valley*, 99 F.Supp.2d at 985. If she finds that such widespread violations are occurring in a State, she is then required by § 1319(a)(2) to issue a compliance order to so notify the State. *Id.* at 984. If after thirty days the State has not corrected the problem, the Administrator is to give public notice of his findings. 33 U.S.C. § 1319(a)(2). "Once public notice is given, the Administrator must enforce the permit conditions until the State remedies its problems." *Save the Valley*, 99 F.Supp.2d at 984; 33 U.S.C. § 1319(a)(2). "The procedures outlined in § 1342(c)(3) call for a public hearing to

take place if the State continues to fail in its enforcement of the NPDES program." *Id.* at 985. If after ninety days following the hearing, the State has failed to take "appropriate corrective action," the Administrator must withdraw approval of the State's program and make public the reasons for the withdrawal. 33 U.S.C. § 1342(c)(3); *Save the Valley,* 99 F.Supp.2d at 985.

Again, the citizen suit provision of the Clean Water Act permits citizens to bring suit to force the Administrator to perform non-discretionary duties under the Act. 33 U.S.C. § 1365(a)(2). An interpretation of the Administrator's duties under sections 1319(a)(2) and 1342(c)(3) other than that settled upon in our previous Entry "would allow the Administrator to frustrate citizen enforcement of the (Act) ... merely by refusing to make a finding or determination." *Save the Valley,* 99 F.Supp.2d at 985; *see also* William L. Andreen, *Beyond Words of Exhortation: The Congressional Prescription for Vigorous Federal Enforcement of the Clean Water Act,* 55 Geo. Wash. L.Rev. 202, 242–53 (1987).

### Clean Water Act's Regulation of Concentrated Animal Feeding Operations

■ The Clean Water Act prohibits point sources from discharging pollutants into waters of the United States unless in conformance with a valid NPDES permit obtained prior to the discharge. 33 U.S.C. §§ 1311, 1342. A point source is defined as "any discernible, confined and discrete conveyance ... from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The term "does not include agricultural stormwater discharges and return flows from irrigated agriculture." *Id.* Under federal law and regulations, CAFOs, though not AFOs, are point sources subject to NPDES permitting requirements. 33 U.S.C. § 1362(14); 40 C.F.R. § 412.10, *et. seq.;* 40 C.F.R. § 122.23. Any

point source, including a CAFO, that discharges or proposes to discharge must obtain an NPDES permit. *See* 40 C.F.R. § 122.21(a). Further, any CAFO that discharges without an NPDES permit remains in a continuing state of violation of the Act until it either obtains an NPDES permit or no longer meets the definition of a point source. *See Carr v. Alta Verde Indus., Inc.,* 931 F.2d 1055 (5th Cir.1991).

States with authorized NPDES permitting programs may issue either general permits or individual permits in order to address point sources within their boundaries. An individual permit is issued to a specific operation and tailored to its pollution issues. A general permit is written to cover a category of point sources with similar characteristics for a defined area. *See* U.S. Envtl. Protection Agency, *Guidance Manual and Example NPDES Permit for Concentrated Animal Feeding Operations, Review Draft* § 4.2 (August 6, 1999). Every individual discharger expected to be covered by a particular general permit is required to submit a written "notice of intent," which serves as a permit application. *Id.* at § 4.2.2. The EPA approves of the use of general permits for CAFOs. *See id.* at §§ 4.1, 4.2 (remarking that general permits are a "cost-effective" and "expedient" approach to ensuring permitting of CAFOs). CAFOs are particularly suited to coverage by general permits because they "involve similar types of operations, require the same kinds of effluent limitations and operating conditions, and can discharge the same types of pollutants." *Id.* at § 4.2. If a state decides to utilize a general permit, it may still issue individual permits to some operations in the category that are exceptionally large, have a history of compliance problems, or are marked by other exceptional characteristics. *Id.* at § 4.3; *see also* 40 C.F.R. 122.28(b)(3).

The EPA is in the process of implementing additional regulations pertaining to CAFOs.[11] One goal of the Unified National Strategy for AFOs is that all "AFOs should develop and implement technically sound, economically feasible, and site-specific comprehensive nutrient management plans (CNMPs) to minimize impact on water quality and public health." U.S. Dept. of Agric. & U.S. Envtl. Protection Agency, *Unified National Strategy for Animal Feeding Operations*, § 1.1 (March 9, 1999), available at *http://www.epa.gov/npdes/pubs/finafost.pdf.* The proposed regulations would also slightly expand the definition of a CAFO, impose additional permit requirements, and impose stricter effluent guidelines. *See* U.S. Envtl. Protection Agency, Office of Water, Proposed Regulations to Address Water Pollution from Concentrated Animal Feeding Operations, 3 (March 2001), EPA 833–F–00–016, available at *http://www.epa.gov/npdes/pubs/CAFO-brochure3.pdf. As part of its goal of enhancing water quality by ensuring CAFO compliance with the Clean Water Act, the EPA also began to focus on improving compliance of state permitting programs with federal requirements.* See *Pl.Ex. J, U.S. Envtl. Protection Agency, Office of Enforcement,* Compliance Assurance Implementation Plan for Concentrated Animal Feeding Operations, 3 (March 5, 1998).

### Regulation of CAFOs in Indiana

In January 1975, the EPA approved Indiana's proposed NPDES program. Declaration of Stephen Jann ("Jann Decl."), ¶ 4. To obtain approval, Indiana was required to show that it had established sufficient legal authority to enable it to administer the program in accordance with federal law. *See* 33 U.S.C. § 1342(b);

327 Ind. Admin. Code, Art. 16. In April 1991, the EPA approved Indiana's program for the issuance and administration of general NPDES permits. *Id.* IDEM is the state agency responsible for administering Indiana's NPDES program. *Id.* As required by the Act and federal regulations, Indiana regulations prohibit point sources from discharging pollutants into waters of the state unless in conformance with a valid NPDES permit obtained from IDEM prior to the discharge. *See* 327 Ind. Admin. Code 5–2–2. However, as of January 2002, IDEM had never issued an NPDES permit to a CAFO.

The State of Indiana has an ongoing obligation to administer its NPDES program in accordance with federal statutes and regulations. The EPA has explained Indiana's obligation as follows:

> As a condition of maintaining its EPA-approved NPDES program, the Clean Water Act, Section 402, requires the IDEM to administer its NPDES program for point sources, including CAFOs, in accordance with the guidelines EPA established at Title 40 of the Code of Federal Regulations, part 123, at all times. Among other things, these guidelines establish requirements approved States must meet in issuing NPDES permits to and evaluating compliance by point sources, including CAFOs. They also establish requirements relative to State authority to enforce compliance with NPDES requirements.

Pl.Ex. O at 3 (EPA notice of meeting to receive public comments on the NPDES program for CAFOs in Indiana).

Historically, Indiana has chosen to deal with CAFOs through a system distinct from their NPDES permitting program. In 1971, the state first enacted legislation

---

11. The EPA plans to take final action on these regulations by December 15, 2002. *See* U.S. Envtl. Protection Agency, Office of Water, *Proposed Regulations to Address Water Pollu-* *tion from Concentrated Animal Feeding Operations*, 3 (March 2001), EPA 833–F–00–016, available at *http://www.epa.gov/npdes/ pubs/ CAFO-brochure3.pdf.*

pertaining to the construction and operation of confined feeding operations, the present version of which is known as the Confined Feeding Control Act, codified at Indiana Code §§ 13–18–10, et. seq. IDEM Mem. at 2. Under Indiana's confined feeding program, IDEM issues approval permits to persons or entities wishing to construct and operate confined feeding operations. The Confined Feeding Control Act defines a confined feeding operation as any operation with confined feeding of more than 300 cattle, 600 swine or sheep, or 30,000 fowl, or any operation with a history of pollution problems. Ind. Code § 13–11–2–40. Thus it covers operations beyond those within the scope of the federal definition of a CAFO. Compare 40 C.F.R. § 122, App. B, with Ind. Code § 13–11–2–40. Approval for a permit is based upon factors outlined in Indiana statutes and regulations. See Ind.Code § 13–18–10–2(c). In the past, IDEM also utilized an Indiana Water Pollution Control Board guidance document known as the Animal Waste 1, or AW–1. The AW–1 specified the supplemental information IDEM required for permit approval. The preamble to AW–1 indicated that it was only a recommendation, so IDEM at times took the position that its requirements were not mandatory. See In Re Matter of: Objections to the Issuance of Permit Approval No. 4245, Top Sow, LLC, Flora, Indiana, Indiana Office of Environmental Adjudication, Cause No. 97–W–J–1693 (May 9, 1997). There is some evidence they viewed their approval permits as no more than recommendations for prudent actions. Pl.Ex. H at 1.

While Indiana's program requires approval based upon Indiana statutes and regulations, prior to approximately 2001, Indiana did not require any confined feeding operations, including federally-defined CAFOs, to apply for or to obtain NPDES permits. The state approval permits issued constituted approvals of "the construction and operation of the manure management system[s]" of the proposed operations. See Ind.Code § 13–18–10–2(c). While apparently designed and intended to prevent discharge of manure into waters of the state, it is not clear that the permits actually implemented any effluent limitations. Thus it is not clear that they were "equivalent" to NPDES permits. Not only did IDEM fail to issue NPDES permits to CAFOs, it appears that IDEM did not inspect CAFOs until 1999. Before 1999, Indiana had never pursued an enforcement action against any CAFO. Jann Dep. at 56.

In 1997, Indiana began to formulate new rules for confined feeding operations, to be codified at Article 16 of Title 327 of the Indiana Administrative Code. IDEM Mem., Ex. B at 1–2. On November 14, 2001, the state's Water Pollution Control Board adopted the new rules.[12] IDEM claims that the new rules contain standards "analogous to those contained in [an EPA] Comprehensive Nutrient Management Plan." Id. at 1. In addition, between sometime in 1999 and January 2002, IDEM completed over 3300 inspections of confined feeding operations, including inspections of all federally-defined CAFOs. Id. at 2. As of February 2002, Indiana had pursued 32 enforcement actions against CAFOs, and had required 18 facilities to apply for individual NPDES permits. IDEM Mem., Ex. A, ¶ 8. The first individual permit for a CAFO in Indiana was publicly noticed in January 2002. However, it bears repeating that as of January 28, 2002, no CAFO in Indiana had ever actually been issued an NPDES permit.[13]

---

**12.** Final adoption of the rules occurred in March 2002, and Article 16 is now officially part of the Indiana Administrative Code. See 327 Ind. Admin. Code art. 16.

**13.** In fact, as recently as January 2002,

Pl. Exs. W, X; Jann Dep. at 55. While Indiana finally appears to be requiring CAFOs that have been found to discharge pollutants to apply for NPDES permits, it is unclear why IDEM requires only that limited group of CAFOs to obtain permits. Indiana and federal regulations require NPDES permits for point sources that discharge or *propose to discharge.* *See* 327 Ind. Admin. Code § 5–2–2; 40 C.F.R. § 122.21(a).

### EPA Knowledge of Indiana's NPDES and Confined Feeding Programs

Throughout the time that Indiana has been in the process of revising its confined feeding rules, the EPA has been following the state's progress and offering guidance. Early in the process, in March 1999, the EPA expressed concern that Indiana's new rules did "not establish a clear link to the Indiana NPDES requirements for CAFOs . . .". Pl.Ex. L at 2. At that time, the EPA pointed out to IDEM that the original Memorandum of Agreement between the two agencies, which is the document under which IDEM is authorized to administer the NPDES program in Indiana, requires IDEM to administer the program in accordance with Section 402 of the Clean Water Act, applicable state regulations, and applicable federal policies and regulations. *Id.* The EPA was obviously concerned that Indiana's confined feeding rules, even as revised, would not satisfy federal requirements for CAFOs. *See id.*

In November 1999, the EPA's Region Five office and IDEM entered into an Environmental Partnership Performance Agreement (EPPA). Under the EPPA, IDEM agreed that the forthcoming adoption of Article 16 of the Indiana Administrative Code would ensure that all CAFOs in Indiana would have a permit equivalent to an NPDES permit. *See* Pl.Ex. M at 1. This was to be accomplished through one of two methods. For an Indiana permit to be equivalent to an NPDES permit, "the confined feeding rule either: (1) must establish an NPDES general permit, as authorized by Indiana Administrative Code title 327, article 15, and the revision to the Indiana NPDES program that EPA approved in 1991, or (2) must itself be submitted to and approved by the [EPA] as a revision to the Indiana NPDES program under 40 C.F.R. § 123.62." Pl.Ex. N at 2. In August 2000, the EPA informed IDEM that by September 30, 2001, it would determine the "recommended course of action regarding Indiana's approved NPDES program." Pl.Ex. N at 3. The EPA stated that at that time, if it concluded that Indiana's confined feeding operation had not been adopted in a timely fashion or did not satisfy NPDES requirements, or that Indiana's compliance monitoring and enforcement program did not conform with both 40 C.F.R. § 123.26 and Indiana's NPDES enforcement management system, it would notify Indiana in writing and recommend to the Administrator of the EPA that she review Indiana's program and commence withdrawal proceedings under 33 U.S.C. § 1342(c)(3). *Id.*

In approximately September 2000, the EPA announced that it would hold a meeting on October 12, 2000 in Lafayette, Indiana to obtain public comments on implementation of the NPDES program for CAFOs by IDEM. Pl.Ex. O at 1, 2. In the announcement, the EPA explained the Clean Water Act and its applicability to CAFOs. Pl.Ex. O at 2–3. It also explained the workings of 33 U.S.C. § 1342(c)(3) and noted that it pertained to a situation in which the "EPA determines,

Indiana expressed its opinion that a better approach to federal regulation of CAFOs would be for EPA to remove CAFOs from the NPDES program, and instead establish a

mechanism similar to the Clean Water Act's biosolids program. *See* Jann Dep., Ex. 13 at 1–2.

after public hearing" that a state is not administering its NPDES program in accordance with the Clean Water Act. Pl.Ex. O at 3. However, in a subsequent paragraph, the announcement pointedly stated that the meeting would not be a public hearing. *Id.*

In November 2000, IDEM requested that the EPA review and comment on the proposed Article 16. Pl.Ex. P at 1. The EPA explained that it currently viewed the proposed rule as a draft general permit, and that after a public comment period, it would consider the rule a proposed general permit. The EPA informed IDEM that the rule did "not yet meet the requirements for a general NPDES permit." *Id.* Specifically, the EPA stated that the rule did not meet the requirements in 40 C.F.R. § 122.28 pertaining to general permits, in § 122.41 pertaining to all NPDES permits, and in § 122.44 containing requirements for the establishment of limitations, standards, and other conditions in all permits. *Id.* The EPA had not yet determined whether the rule complied with § 122.46, which provides that NPDES permits are to be issued for a term not to exceed five years. Pl.Ex. P at 2. The EPA expressed other concerns regarding IDEM's intentions in situations where phosphorus in soils may represent a water threat. Pl.Ex. P at 2–3.

In February 2001, IDEM announced it would publish a First Notice of Rulemaking for the proposed Article 16 on March 1, 2001. Pl.Ex. Q at 1. IDEM also noted that it did not believe the EPA's comments could be resolved before that date, but stated it hoped to address them "in as timely [a] manner as possible." *Id.* In September 2000, IDEM had stated in a letter to the EPA that it was not yet possible to determine whether the draft rules satisfied the EPA's "preferences" for a state program. Jann Dep., Ex. 12 at 2. However, IDEM also stated in that letter

its hope that a final Indiana rule would ultimately be approved by the EPA as environmentally equivalent to the federal program under one of the approaches outlined in the EPA's letters. *Id.*

In a letter dated July 20, 2001, the EPA told IDEM, "it is important for you to understand the need for IDEM to aggressively implement the NPDES program for CAFOs that are subject to the existing, 25–year old federal regulations." Pl.Ex. S at 1. The EPA went on to remind IDEM that "[u]nder the Clean Water Act and EPA's 1975 approval of the Indiana NPDES program, IDEM is required to issue NPDES permits to CAFOs, evaluate compliance with NPDES program requirements by CAFOs, and, when violations are discovered, enforce compliance in accordance with Indiana's NPDES enforcement management system." *Id.* The EPA reiterated IDEM's choices for satisfying its obligation to issue NPDES permits to CAFOs, which included issuing all federally-required individual permits, issuing one or more general permits, or submitting the amended rule to EPA as an approvable revision to the Indiana NPDES program. Pl.Ex. S. at 2. The EPA "strongly urged" IDEM to select one of the available choices "as expeditiously as possible." *Id.* The letter gave deadlines for the different courses of action available to IDEM. If IDEM chose to issue individual permits, it was to submit to the EPA a proposed plan, with a schedule and milestones, by November 2001. *Id.* If IDEM chose the general permit route, it was to issue a proposed general permit or permits to the EPA by December 2001. *Id.* If it chose to submit the rule to IDEM as a revision to the program under 40 C.F.R. 123.62, it was to do so by June 2002. *Id.* The EPA requested that IDEM respond to its letter by August 20, 2001 and confirm that it had met or would very soon meet the EPA's expectations for compliance evaluation and

enforcement. *Id.* The EPA delayed until September 2002 the deadline for the determination of its "recommended course of action" regarding withdrawal proceedings under 33 U.S.C. § 1342(c)(3). *Id.*

IDEM responded to the EPA's letter in a letter dated September 11, 2001. Pl.Ex. T at 1. IDEM pointed out that it had passed "first-ever rules governing confined feeding operations in Indiana, implementing [the] state statute which has been in place since 1972." *Id.* IDEM also noted that it had published a first notice of rulemaking to develop a specific rule governing CAFOs for the purpose of NPDES, in the event such a rule was needed. Pl.Ex. T at 2. IDEM directly asked the EPA to provide the criteria used to determine whether a state's NPDES permit program will be proposed for withdrawal.[14] *Id.* The letter went on to point out that the 1999 U.S. EPA/USDA *Unified National Strategy* contemplated functionally equivalent state programs. *Id.* IDEM stated its belief that its revised program would "yield a comparable level of environmental protection to the strategy outlined by U.S. EPA and U.S. Department of Agriculture." *Id.* Then, incredibly, IDEM posed the following question to the EPA: "Can you please describe the circumstances in which a state may operate a confined feeding approval program without specifically requiring an NPDES individual permit, NPDES general permit, or NPDES permit-by-rule for CAFOs?" *Id.*

### Findings Under Section 1342(c)(3)

The most generous interpretation of IDEM's final question to the EPA is that it wanted to know the procedure for submission of the confined feeding rule to the EPA for approval as a revision to Indiana's NPDES program, pursuant to 40 C.F.R. § 123.62. Of course, the procedure is outlined in 40 C.F.R. § 123.62. Another,

and we think more likely, interpretation of IDEM's question is that it believed its program to be sufficiently "comparable" so that, despite being directly and repeatedly informed otherwise by the EPA, circumstances might exist under which it need not develop any rules relating to NPDES permitting for CAFOs. It is unclear why IDEM thought it might not need a rule for the NPDES program as it relates to CAFOs. *See* Pl.Ex. T at 2. No evidence before us on these motions indicates whether IDEM met the deadlines in November and December 2001 that were imposed by the EPA in the event IDEM chose to issue permits in order to meet its obligations regarding CAFOs. The deadline for IDEM to submit the confined feeding rule to the EPA as an approvable revision to its program was set for June 2002. Pl.Ex. S at 2. Again, there is no evidence before us concerning which, if any, approach IDEM chose, or whether it met the relevant deadline if in fact it did choose one of the allowable options.

In any case, it is clear that Indiana's Water Pollution Control Board adopted the new confined feeding rules in November 2001 even though they still did not completely comply with the Clean Water Act and federal regulations concerning CAFOs. At this point, the EPA had been informing IDEM for two years of the requirements for CAFOs that needed to be included in the new rules. Indiana's program had apparently *never* been in compliance with respect to CAFOs: in the past, IDEM did not have an inspection program or require CAFOs to obtain NPDES or NPDES-equivalent permits. As of the September 11, 2001, letter, IDEM appears still not to even understand what was required to bring the program into compliance. In addition, Indiana appears to believe that its confined feeding program is

---

**14.** The criteria are readily available at 40    C.F.R. § 123.63.

at least as effective or more effective than the use of NPDES permits. *See* Pl.Ex. T at 2. Whether or not that is true, Indiana's EPA-authorized NPDES program must nonetheless comply with federal laws and regulations.

The EPA stated in its July 20, 2001 letter to IDEM that by September 2002, it would determine the recommended course of action with regard to withdrawal of the Indiana NPDES program. To its credit, EPA has engaged in significant efforts to assure the compliance of the Indiana NPDES program with federal law regarding CAFOs, working for at least three years with IDEM to help them develop appropriate rules. IDEM has nonetheless failed to do so.

We agree with Plaintiffs that Indiana's program is not in compliance, and that the evidence shows EPA has known that to be true for some time. Nonetheless, we decline to take the drastic action for which Plaintiffs pray; that is, we decline to compel the EPA to act immediately to withdraw approval of Indiana's NPDES program. IDEM, as a party to this action by choice, is also within the reach of our ruling here, and we think it is that agency who must first be compelled to act.[15] Thus, we shall order in our Judg-

ment that IDEM, if it has not already done so, act forthwith to bring its program into compliance with the Clean Water Act and with federal regulations by adopting one of the options outlined in the EPA's July 20, 2001 letter to IDEM; IDEM is to take this action within 120 days of the date of this Entry.[16] We note that IDEM has already initiated the rulemaking process for a specific rule governing CAFOs for the purposes of NPDES. Of course, when and if the EPA takes final action on the proposed new federal regulations regarding CAFOs, IDEM would need to ensure that Indiana's programs comply with the federal requirements. We think it would be prudent for IDEM to address any such changes to its NPDES program at the same time it undertakes the actions ordered herein.

Should IDEM fail to act as herein ordered, under 33 U.S.C. § 1342(c)(3) and 40 C.F.R. §§ 123.63 and 123.64, the EPA shall be ordered in the accompanying Judgment to undertake and process withdrawal proceedings for Indiana's program by scheduling and conducting a public hearing within 150 days of the date of this Entry, and, within 30 days after the date of such hearing, to make and announce its determination regarding whether Indiana

**15.** By the very act of intervening, an intervenor renders itself "vulnerable to complete adjudication by the federal court of the issues in litigation between the intervenor and the adverse party." *United States v. Oregon,* 657 F.2d 1009, 1014 (9th Cir.1981) (quoting 3B Moore's Federal Practice ¶ 24.16[6] (2d ed.1981)). The intervenor assumes the risk that its position will not prevail and that an order adverse to its interests will be entered. *Schneider v. Dumbarton Developers, Inc.,* 767 F.2d 1007, 1017 (D.C.Cir.1985) (citing 7A Wright & Miller, Federal Practice & Procedure § 1920, at 611 (1972)).

**16.** Federal courts are empowered to order state officials to comply with federal law. "[W]hen a plain official duty, requiring no

exercise of discretion, is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have a mandamus to compel its performance," and it is no objection that such an order might be sought in the federal courts against a state officer. *Puerto Rico v. Branstad,* 483 U.S. 219, 227–28, 107 S.Ct. 2802, 2808, 97 L.Ed.2d 187 (1987) (quoting *Bd. of Liquidation v. McComb,* 92 U.S. 531, 541, 23 L.Ed. 623 (1875)). "Moreover, the Supremacy Clause makes federal law paramount over the contrary positions of state officials; the power of federal courts to enforce federal law thus presupposes some authority to order state officials to comply." *New York v. U.S.,* 505 U.S. 144, 179, 112 S.Ct. 2408, 2430, 120 L.Ed.2d 120 (1992).

is administering its program in accordance with Section 402 of the Clean Water Act. Under 40 C.F.R. § 123.63, withdrawal will be appropriate if Indiana continues to fail to issue NPDES or NPDES-equivalent permits as required by the Act to all CAFOs that discharge, have discharged in the past, or propose to discharge, and if Indiana's program continues to fail to comply with the terms of the Memorandum of Agreement between IDEM and the EPA.

We are acutely aware of the harmful effects that could result from the immediate withdrawal of Indiana's NPDES program. The program regulates municipal wastewater dischargers, wastewater treatment plants, industrial wastewater dischargers, stormwater activities, construction activities, aquaculture and silviculture activities, and more. *See* IDEM Mem. at 7. Withdrawal of the program would impose significant administrative burdens on the EPA. For those very reasons, we have allowed IDEM what we believe is more than adequate time to bring its program into compliance, and we have conditioned the requirements placed upon the EPA on IDEM's noncompliance with our Order.

***Findings Under Section 1319(a)(2)***

With respect to Plaintiffs' Section 1319(a)(2) claim, we believe that the present situation does not yet warrant an EPA take over of enforcement of Indiana's NPDES program. Section 1319(a)(2) states, in part, that "[w]henever, on the basis of information available to him, the Administrator finds that violations of permit conditions or limitations . . . are so widespread that such violations appear to result from a failure of the State to enforce such permit conditions or limitations effectively, [s]he shall so notify the State." The section further states that the Administrator will take over enforcement of the State's program if the State's failure extends beyond the thirtieth day after notice was given. The listed methods by which

the Administrator is to enforce the program are through issuing compliance orders to permit holders or by bringing civil actions to enforce permit conditions or limitations. There are at least two reasons why application of this section to the present situation is problematic. First, one of the deficiencies in Indiana's approach has been that the State did not issue NPDES permits to CAFOs. Thus, there have been no CAFO permits over which the Administrator could have assumed enforcement. Second, Indiana's program was marked by a lack of compliance inspections and enforcement, which failure appears to have now been remedied. Before 1999, based on the lack of inspections a federal takeover under Section 1319(a)(2) might have been warranted, but between 1999 and 2002 apparently every CAFO in the state has been inspected. IDEM Mem., Ex. B at 2. In any event, we remain uncertain about whether the lack of inspections alone could trigger this provision, given its focus on issued permits. Thus, for both of these reasons, we do not believe that an order to the EPA to take over enforcement of Indiana's NPDES program is appropriate at this time. We opt instead for what we regard as the more appropriate remedy, found in section 1342(c)(3), which is premised on whether a state is administering its program in accordance with the requirements of the Clean Water Act and federal regulations.

***CONCLUSION***

For the reasons explained in the preceding sections, with respect to Plaintiffs' claims under 33 U.S.C. § 1319(a)(2) and 1342(b), the EPA's and IDEM's Motions for Summary Judgment are GRANTED, while Plaintiffs' Motion for Summary Judgment is DENIED. With respect to 33 U.S.C. § 1342(c)(3), Plaintiffs' Motion for Summary Judgment is GRANTED, while the EPA's and IDEM's Motions are

accordingly DENIED. Pursuant to 33 U.S.C. § 1365(a), a judgment will be entered for Plaintiffs concerning their claims under 33 U.S.C. § 1342(c)(3).

## FINAL JUDGMENT

Pursuant to the Court's entry of this date, Judgment is hereby entered in favor of the Plaintiffs, Save the Valley, Incorporated and Thomas and L. Jae Breitweiser, with respect to their claim arising under 33 U.S.C. § 1342(c)(3), and against the Defendants, United States Environmental Protection Agency, et al., and Indiana Department of Environmental Management. With respect to Plaintiffs' claims under 33 U.S.C. § 1319(a)(2) and 33 U.S.C. § 1342(b), Judgment is hereby entered in favor of Defendants and against Plaintiffs.

Having ruled in favor of Plaintiffs on their claim under 33 U.S.C. § 1342(c)(3), now therefore,

It is hereby ORDERED that, within one hundred twenty (120) days of the date of this Judgment, the Indiana Department of Environmental Management ("IDEM") shall bring its National Pollutant Discharge Elimination System ("NPDES") program into compliance with section 402 of the Clean Water Act, 33 U.S.C. § 1342;

FURTHER, it is Ordered that, within one hundred twenty (120) days of the date of this Judgment, IDEM shall *either:* (1) establish an NPDES general permit for federally-defined concentrated animal feeding operations ("CAFOs"), as authorized by Indiana Administrative Code title 327, article 15, and the revision to the Indiana NPDES program that the United States Environmental Protection Agency ("the EPA") approved in 1991, *or* (2) require every CAFO in the State of Indiana who has discharged pollutants in the past without an NPDES permit or proposes to discharge pollutants sometime in the future to apply for and obtain by a date certain an individual NPDES permit, if it

has not already done so, *or* (3) submit an appropriate confined feeding rule to the EPA for approval by the EPA as a revision to the Indiana NPDES program under 40 C.F.R. § 123.62.

FURTHER, it is Ordered that, within one hundred fifty (150) days of the date of this Judgment, should IDEM continue in its failure to fulfill its obligations under this Order, the EPA shall conduct a public hearing pursuant to 33 U.S.C. § 1342(c)(3) concerning whether the State of Indiana is administering its program in accordance with Section 402 of the Clean Water Act.

FURTHER, it is Ordered that, within thirty (30) days of such public hearing, should IDEM continue in its failure to fulfill its obligations under this Order, the Administrator of the EPA shall notify the State of Indiana, through IDEM, that absent immediate, appropriate corrective action, she will withdraw approval of Indiana's NPDES program pursuant to 33 U.S.C. § 1342(c)(3).

FURTHER, it is Ordered that, within ninety (90) days after the Administrator so notifies the State of Indiana, should IDEM continue in its failure to take appropriate corrective action, the Administrator of the EPA shall withdraw approval of the State of Indiana's NPDES program, pursuant to 33 U.S.C. § 1342(c)(3).